**James BENJAMIN et al., Plaintiffs–Appellants,**

v.

**Michael JACOBSON, Commissioner of the Department of Correction of the City of New York, et al., Defendants–Appellees.**

**Docket No. 96–7957.**

United States Court of Appeals, Second Circuit.

Argued en banc Feb. 25, 1998.

Decided March 23, 1999.

John Boston, New York, New York (Daniel L. Greenberg, Sarah Kerr, Dori A. Lewis, Marta Nelson, The Legal Aid Society, Prisoners' Rights Project, New York, New York, on the brief), for Plaintiffs–Appellants.

Lorna B. Goodman, Assistant Corporation Counsel, New York, New York (Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, June R. Buch, Laura A. Chamberlain, Florence A. Hutner, Assistant Corporation Counsel, on the brief), for Defendants–Appellees.

Sara L. Shudofsky, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, New York, New York, Frank W. Hunger, Assistant Attorney General, Robert M. Loeb, Attorney, Civil Division, Department of Justice, Washington, D.C., James L. Cott, Assistant United States Attorney, New York, New York, on the brief), for Intervenor United States of America.

Dennis C. Vacco, Attorney General of the State of New York, Albany, New York (Peter H. Schiff, Deputy Solicitor General, Martin A. Hotvet, Assistant Attorney General, Albany, New York; Bill Pryor, Attorney General, State of Alabama, Montgomery, Alabama; Grant Woods, Attorney General, State of Arizona, Phoenix, Arizona; Richard Blumenthal, Attorney General, State of Connecticut, Hartford, Connecticut; M. Jane Brady, Attorney General, State of Delaware, Wilmington, Delaware; Robert A. Butterworth, Attorney General, State of Florida, Tallahassee, Florida; Thurbert E. Baker, Attorney General, State of Georgia, Atlanta, Georgia; Gus F. Diaz, Acting Attorney General, Territory of Guam, Agana, Guam; Margery S. Bronster, Attorney General, State of Hawaii, Honolulu, Hawaii; James E. Ryan, Attorney General, State of Illinois, Chicago, Illinois; Thomas J. Miller, Attorney General, State of Iowa, Des Moines, Iowa; Carla J. Stovall, Attorney General, State of Kansas, Topeka, Kansas; Richard P. Ieyoub, Attorney General, State of Louisiana, Baton Rouge, Louisiana; J. Joseph Curran, Jr., Attorney General, State of Maryland, Baltimore, Maryland; Scott Harshbarger, Attorney General, Commonwealth of Massachusetts, Boston, Massachusetts; Frank J. Kelley, Attorney General, State of Michigan, Lansing, Michigan; Mike Moore, Attorney General, State of Mississippi, Jackson, Mississippi; Joseph P. Mazurek, Attorney General, State of Montana, Helena, Montana; Don Stenberg, Attorney General, State of Nebraska, Lincoln, Nebraska; Frankie Sue Del Papa, Attorney General, State of Nevada, Carson City, Nevada; Philip T. McLaughlin, Attorney General, State of New Hampshire, Concord, New Hampshire; Tom Udall, Attorney General, State of New Mexico, Santa Fe, New Mexico; Betty D. Montgomery, Attorney General, State of Ohio, Columbus, Ohio; D. Michael Fisher, Attorney General, Commonwealth of Pennsylvania, Harrisburg, Pennsylvania; Jeffrey B. Pine, Attorney General, State of Rhode Island, Providence, Rhode Island; Jan Graham, Attorney General, State of Utah, Salt Lake City, Utah; Mark F. Earley, Attorney General, Commonwealth of Virginia, Richmond, Virginia; and James E. Doyle, Attorney General, State of Wisconsin, Madison, Wisconsin, of counsel), filed a brief for Amici Curiae States of New York, Alabama, Arizona, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Iowa, Kansas, Louisiana, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, Ohio, Rhode Island, Utah, and Wisconsin, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the Territory of Guam, in support of Defendants–Appellees.

Before: WINTER, Chief Judge, and OAKES, KEARSE, WALKER, McLAUGHLIN, JACOBS, LEVAL, CALABRESI, CABRANES, and PARKER, Circuit Judges.

Judge JACOBS concurs in the majority opinion, and files a separate opinion joined by Chief Judge WINTER and Judges KEARSE, JOHN M. WALKER, Jr., McLAUGHLIN, JOSEÉ CABRANES, and PARKER.

Judge LEVAL concurs in all but Part II.A. of the majority opinion, and files a separate opinion joined by Judge OAKES and joined in part by Judge CALABRESI.

Judge CALABRESI concurs in the result, and files a separate opinion.

KEARSE, Circuit Judge, with whom Chief Judge WINTER, and Judges WALKER, McLAUGHLIN, JACOBS, CABRANES, and PARKER join, and with whom Judges OAKES and LEVAL join except for Part II.A.:

Plaintiffs James Benjamin *et al.*, who are pretrial detainees, appealed from an order of the United States District Court for the Southern District of New York, Harold Baer, Jr., *Judge,* entered pursuant to the Prison Litigation Reform Act of 1995 ("PLRA" or the "Act"), Pub L. No. 104–134, 110 Stat. 1321–66 §§ 801–810 (1996), *codified at* 18 U.S.C. § 3626 (Supp. II 1996); *see also* 18 U.S.C.A. §§ 3626(b)(3), (e)(2), (e)(3) (West Supp. 1998), vacating certain consent decrees entered in 1978 and 1979 (the "Consent Decrees" or the "Decrees") in actions brought by classes of pretrial detainees against defendant officials of the City of New York (collectively the "City") to challenge the conditions of confinement of persons held in City institutions awaiting trial or other disposition of criminal charges. The district court rejected plaintiffs' challenges to the constitutionality of the PLRA's provision requiring the termination of consent decrees not meeting criteria set by the Act, vacated the Consent Decrees, and dissolved the injunctions that had been entered pursuant to the Decrees. *See Benjamin v. Jacobson,* 935 F.Supp. 332 (1996) ("*Benjamin I*"). A unanimous panel of this Court upheld the district court's rejection of the constitutional challenges but reversed the vacatur of the Decrees, ruling that the Act does not call for the termination of consent decrees not meeting the requirements of the Act, but merely limits the power of federal courts to enforce those decrees and leaves the decrees intact

and enforceable in state courts. *See Benjamin v. Jacobson,* 124 F.3d 162 (1997) ("*Benjamin II*"). On *en banc* reconsideration, we conclude that the PLRA requires the termination of consent decrees that do not meet the criteria established by the Act; that that provision does not violate the constitutional principle of separation of powers or infringe the due process, equal protection, and other constitutional rights invoked by plaintiffs; and that plaintiffs should be afforded an opportunity to show that, under the Act's criteria, the continuation of prospective relief is warranted. We therefore vacate the decision of the panel; we affirm in part and reverse in part the order of the district court and remand for further proceedings.

## I. BACKGROUND

This action comprises seven related class actions brought during the mid–1970s by pretrial detainees in certain New York City jails, alleging that conditions of their confinement violated their constitutional rights. *See Benjamin v. Malcolm,* 75 Civ. 3073 (S.D.N.Y.) (Rikers Island House of Detention for Men, now called the James A. Thomas Center); *Forts v. Malcolm,* 76 Civ. 101 (S.D.N.Y.) (Rikers Island Correctional Institution for Women, now called the Rose M. Singer Center); *Ambrose v. Malcolm,* 76 Civ. 190 (S.D.N.Y.) (Bronx House of Detention for Men); *Maldonado v. Ciuros,* 76 Civ. 2854 (S.D.N.Y.) (Rikers Island Adolescent Reception and Detention Center); *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 79 Civ. 4913 (E.D.N.Y.); *Detainees of the Queens House of Detention for Men v. Malcolm,* 79 Civ. 4914 (E.D.N.Y.); *Rosenthal v. Malcolm,* 74 Civ. 4854 (S.D.N.Y.) (Rikers Island Adult Mental Health Unit). The Consent Decrees were designed "to ensure that prison conditions became and remained safe and humane." *Benjamin I,* 935 F.Supp. at 337. The Decrees, *inter alia,*

ensure that detainee mail and property are handled properly, and that proce-

dures in concert with constitutional protections are followed during detainee cell and body searches. On an institutional level, the Consent Decrees seek to maintain the physical plant of the jails in a condition safe for human habitation. They mandate that attention be given to vermin and insect control, sanitation, maintenance and refuse removal. Other provisions govern food services to the detainees and ensure that the detainees are adequately fed while in custody, with food that is prepared and served in a sanitary environment.

*Id.* As noted in *Benjamin II,* "[t]hese decrees have generated a judicially administered structure comprising over ninety related court orders and extending to more than thirty discrete areas of prison administration." 124 F.3d at 165.

## A. *The PLRA and the Proceedings in the District Court*

Effective April 26, 1996, Congress enacted the PLRA which, *inter alia,* provides that in civil actions arising under federal law challenging conditions in prisons (including pretrial detention facilities) "prospective relief" may not be granted in the absence of certain findings:

> [p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). With respect to judgments entered prior to the effective date of the PLRA, the Act provides for the termination of prospective relief that was ordered without the court having made these findings as to need, narrowness, and intrusiveness:

> IMMEDIATE TERMINATION OF PROSPECTIVE RELIEF.—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

*Id.* § 3626(b)(2) ("termination provision"). However, the Act provides that even if the need-narrowness-intrusiveness findings had not been made in connection with the entry of the decree, the prospective relief is not to be terminated

> if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C.A. § 3626(b)(3) (West Supp.1998), *as amended and made applicable to all pending cases, see* Pub.L. No. 105–119, § 123(a)(2) & (b), 111 Stat. 2440, 2470 (Nov. 26, 1997) (changing "current or ongoing" to "current and ongoing").

In the Act, "the term 'prospective relief' " is defined to "mean[ ] all relief other than compensatory monetary damages," 18 U.S.C. § 3626(g)(7), and " 'relief' means all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements," *id.* § 3626(g)(9). The term "private settlement agreement" is defined to "mean[ ] an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding

that the agreement settled," *id.* § 3626(g)(6); the term "consent decree" is defined to "mean[ ] any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlement agreements," *id.* § 3626(g)(1).

Shortly after the PLRA's effective date, the City moved for the immediate termination of the Consent Decrees and related orders on the ground that the Decrees had been entered without the need-narrowness-intrusiveness findings required by the PLRA. Plaintiffs conceded that no such findings had been made and that the requisite findings would not be supported by the record in its present state; but they challenged the constitutionality of the Act as applied to existing consent decrees, arguing principally that it violates the constitutional principle of separation of powers and denies them equal protection and due process. In support of their separation of powers contention, plaintiffs argued that the Act requires the reopening of final judgments and thereby exceeds Congress's power as elucidated in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("*Plaut* "), and impermissibly prescribes a rule of decision without changing the underlying substantive law, contrary to the principle established in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). They also argued that the Act impermissibly deprives the federal courts of their Article III power to remedy violations of constitutional rights. Plaintiffs requested an opportunity, if the court rejected their constitutional arguments, to create a factual record as to the current conditions in City detention facilities in order to permit the court to make the findings required by 18 U.S.C.A. § 3626(b)(3) (West Supp.1998) for the continuation of the injunctive relief granted by the Consent Decrees. The United States intervened in the action in order to defend the constitutionality of the Act. *See* 28 U.S.C. § 2403(a).

In *Benjamin I*, the district court upheld the constitutionality of the Act's termination provision and granted the City's motion. *See* 935 F.Supp. at 358. The court reasoned that the Act does not violate the principle barring Congress from reopening final judgments because a consent decree calling for continued compliance with prescribed standards is not a final judgment in the same sense in which a judgment for monetary relief would be final:

> Where the suit is an action at law for damages and the judgment has become final for *res judicata* purposes, the judgment is no longer subject to congressional enactments. *See Plaut*, [514 U.S. at 225–26, 115 S.Ct. 1447]. Where the judgment imposes an executory decree, though, and the court retains supervisory jurisdiction, the judgment's prospective effects are not final for separation-of-powers purposes.

*Benjamin I*, 935 F.Supp. at 345. The district court viewed "the Consent Decrees [as] executory judgments with prospective effects," and noted that they "impose[d] injunctive relief over which this Court has retained supervisory jurisdiction." *Id.* at 347. The court concluded that the Decrees were subject to alteration by Congress without infringing the principle announced by *Plaut*.

The district court also found no violation of the principle enunciated in *United States v. Klein*. It reasoned that "while Congress did not amend the substantive law with respect to permissible prison conditions," it also did not prescribe a substantive rule of decision but merely "change[d] the law governing the district court's remedial powers." *Benjamin I*, 935 F.Supp. at 350. The court also rejected the suggestion that the PLRA prevented the courts from effectively remedying violations of constitutional rights. It observed that the Act allows the courts, on the condition that they make the requisite findings as to relief, to "continue to define the scope of prisoners' constitutional

rights, review the factual record, apply the judicially determined constitutional standards to the facts as they are found in the record and determine what relief is necessary to remedy the constitutional violations." *Id.* at 351.

The district court rejected plaintiffs' due process arguments, reasoning that because the Consent Decrees were not "final" with respect to future conditions, plaintiffs had no vested rights in their continued enforcement. *See id.* at 356. The court rejected the equal protection arguments, noting that prisoners are not a suspect class and stating, *inter alia,* that the Act was "supported by plausible legitimate government interests and the means chosen to advance these goals are rationally designed." *Id.* at 354.

The court also denied plaintiffs' request for an opportunity to present evidence as to the need for continuation of the prospective relief provided for in the Decrees. It stated that "[t]he statute provides for 'immediate termination' and based on the current record before the Court, the defendants are entitled to vacatur of the Consent Decrees." *Id.* at 357. The court entered an order stating that "the Consent Decrees in these cases are VACATED pursuant to 18 U.S.C. § 3626(b)(2)." 935 F.Supp. at 358.

Plaintiffs promptly asked the court to, *inter alia,* rescind its vacatur of the Consent Decrees pending a hearing as to the existence of continuing violations. They argued that because of the course, complexity, and time-pressures of the litigation, they had not had an opportunity to present such evidence. In the alternative, plaintiffs asked the court to certify questions of the Act's interpretation and constitutionality for an immediate appeal and to stay its ruling pending appeal. The court denied the motions for rescission and a hearing but granted the motion for a stay until such time as a stay pending appeal could be sought from this Court.

Plaintiffs promptly appealed, and this Court granted motions for an expedited appeal and a stay.

### B. *The Panel Decision*

Plaintiffs pursued their constitutional challenges to the PLRA on appeal. In *Benjamin II,* the panel unanimously affirmed the district court's rejection of the constitutional challenges to the termination provision, albeit on different reasoning, and it reversed the vacatur of the Consent Decrees. The panel based its conclusions on its view that the Act does not require the termination of consent decrees entered without the mandated need-narrowness-intrusiveness findings; rather the panel concluded that the Act merely prohibits *federal* courts from enforcing such decrees and leaves parties free to seek enforcement of the consent decrees in state courts.

The panel began by noting that the PLRA had been enacted in part to answer the criticism that federal courts had overstepped their authority in the context of prison litigation. After quoting § 3626(b)(2)'s provision for "the immediate termination of any prospective relief if the relief was approved or granted in the absence of" the specified need-narrowness-intrusiveness findings, the panel stated as follows:

This language can be read in either one of two ways, each of which, if constitutionally valid, would respond to the criticisms that led to the PLRA. The first interpretation would limit the jurisdiction of federal courts so that these courts could not in the future enforce past consent decrees, except insofar as the decrees were found to be tailored to a federal right. The second would render null and void all past federally approved prison consent decrees unless these decrees met the requirement of being narrowly tailored to a federal right....

The correct reading of the section turns on the meaning of the words "termination of prospective relief." If

"prospective relief" includes the past Decrees themselves, then these are terminated and annulled under the law. If, instead, "termination of prospective relief" means that no future relief—that is neither future enforcement nor articulation—is available in federal courts under past Decrees, then the Decrees remain valid, but no longer subject to federal jurisdiction.

At a glance, the second interpretation seems plausible. The statute defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). It also states that "the term 'relief' means all relief in any form that may be granted or approved by the court, and *includes consent decrees* but does not include private settlement agreements." 18 U.S.C. § 3626(g)(9) (emphasis added). One could, therefore, maintain that "prospective relief" includes the Decrees because (1) "prospective relief" includes all relief except damages, (2) "relief" includes "consent decrees," and (3) consent decrees are not damages.

But, in fact, such a reading has significant linguistic problems. Taken literally, it would imply that the word "relief," without more, includes within it "private settlement agreements." Yet it would be a remarkable twisting of language to describe a contract or an agreement as a form of relief. We simply do not talk that way. The ordinary way of talking and writing is to speak of relief *available under or pursuant to* a private settlement agreement. Since it is clear that private settlement agreements are not a form of relief, why does the definition expressly exclude them? Under the circumstances, it makes more sense to read the definitional phrase as saying "the term 'relief' means all relief in any form that may be granted or approved by the court, and includes [all relief granted pursuant to] consent decrees but does not include [relief granted pursuant to] private settlement agreements." While one can define anything

to mean anything, courts should be reluctant to read a definitional sentence to mean something that makes another part of the same sentence meaningless or completely superfluous.

124 F.3d at 166–67 (emphases and brackets in original). The panel found that its second hypothesized interpretation (*i.e.*, that the Act requires annulment of past federal consent decrees not narrowly tailored to the vindication of a federal right) created serious separation of powers problems, for "[u]nder the second interpretation, the termination provision will strip the plaintiffs of all of the protections they negotiated into the Consent Decrees except for those narrowly tailored to federal rights." *Id.* at 168.

Instead, reasoning that "federal consent decrees are not only federal court judgments but also, and separately, contracts arising under state law," the panel adopted its first interpretation (*i.e.*, that the PLRA simply eliminates the federal courts' enforcement jurisdiction), concluding that the "underlying contract, in its time made into a judgment, is left untouched." *Id.* at 178. The panel concluded that the PLRA "simply force[s] the plaintiffs to seek redress for the non-federal aspects of the Decrees in state court as opposed to federal court." *Id.* at 168.

The panel also concluded that in light of its interpretation that the Act "does not annul the underlying Decrees, but, instead, only changes the forum in which they can be enforced," *id.* at 174, plaintiffs' constitutional challenges should be rejected. *See, e.g., id.* at 170, 173, 174, 176–77 (separation of powers); *id.* at 176 (due process); *id.* at 177 n. 18 (due process and equal protection).

In sum, the panel concluded that "the non-federal aspects of the Consent Decrees are hereafter not to be enforced by the federal courts," but that the plaintiffs "should be able to get all the relief from state courts, including specific performance, that had previously been available

154

to them federally under the Consent Decrees." *Id.* at 178. "[W]hile the defendants may be entitled to immediate termination of prospective relief from the *federal* courts, there is nothing to prevent the plaintiffs from seeking the enforcement of the Consent Decrees in *state* courts." *Id.* at 165 (emphases in original). In light of its conclusion that prospective relief entered without the required need-narrowness-intrusiveness findings need not be terminated, and that the Act merely requires that enforcement of that relief be sought in state court, the panel reversed the district court's vacatur of these Consent Decrees and ruled that plaintiffs are entitled, at their option, to have an evidentiary hearing in the district court on their allegations of current and ongoing violations of federal rights or to "seek enforcement of the Decrees in their entirety in state court." *Id.* at 180.

C. *Rehearing* En Banc

The City petitioned for rehearing, with a suggestion for rehearing *en banc,* arguing principally that the panel had misinterpreted the PLRA, and in doing so had "vitiate[d] the redress that Congress sought to provide to overburdened states and municipalities by transforming a statute intended to protect defendants from extra-constitutional burdens into one that ensures the perpetuation of those burdens via the state courts." (City Petition for Rehearing at 3.) In December 1997, we agreed to rehear the appeal *en banc.*

On rehearing, plaintiffs contend principally (1) that *Benjamin II* 's construction of the PLRA as terminating only the Decrees' enforceability in federal, not state, court, was correct, and (2) that this Court should nonetheless conclude that the Act's termination provision violates Article III of the Constitution and the principle of separation of powers, and that application of the termination provision to the Decrees denies them due process and equal protection. They also urge, if the Act's termination provision is upheld, that they be

given a meaningful opportunity to present evidence to the district court that the Decrees should be continued.

The City disagrees with *Benjamin II* 's interpretation of the PLRA. It argues that the district court's decision upholding the constitutionality of the PLRA and vacating the Decrees was correct, and it urges that the order of the district court be affirmed. The State of New York has filed a brief on behalf of itself and numerous other States as *amici curiae,* supporting the position of the City. The United States, as intervenor, has filed a brief arguing that the Act is not unconstitutional, that the panel opinion in *Benjamin II* should be reversed to the extent that it does not uphold the PLRA as written, and that the matter should be remanded to the district court for further proceedings to determine the need for continuation of the future relief ordered in the Decrees.

For the reasons that follow, we conclude that the Act provides for the termination, though not the annulment, of consent decrees that do not meet the need-narrowness-intrusiveness criteria established by the Act; that plaintiffs' constitutional challenges to the termination provision were properly rejected; and that plaintiffs were entitled to an opportunity to show, in accordance with the Act, that any or all of the prospective relief ordered by the Decrees should be continued. We therefore vacate the panel decision, affirm the district court's rejection of plaintiffs' constitutional challenges, reverse the district court's vacatur of the Consent Decrees, and remand for further proceedings.

II. INTERPRETATION
OF THE PLRA

A. *The Scope of the PLRA's Termination Provisions*

The PLRA sets limitations on, *inter alia,* the power of the courts to continue certain forward-looking relief in civil actions challenging conditions in prisons or

pretrial detention facilities. It provides, in pertinent part, as follows:

(b) TERMINATION OF RELIEF.—

. . . .

(2) IMMEDIATE TERMINATION OF PROSPECTIVE RELIEF.—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

(3) LIMITATION.—Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

. . . .

(c) SETTLEMENTS.—

(1) CONSENT DECREES.—In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).

(2) PRIVATE SETTLEMENT AGREEMENTS.—(A) Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a), if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled.

(B) Nothing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court any remedy available under State law.

18 U.S.C. §§ 3626(b)(2), (c); 18 U.S.C.A. § 3626(b)(3) (West Supp.1998).

The most pertinent terms used in these provisions are defined in the Act as follows:

(1) the term "consent decree" means any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements;

. . . .

(5) the term "prison" means any Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law;

(6) the term "private settlement agreement" means an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled;

(7) the term "prospective relief" means all relief other than compensatory monetary damages;

. . . .

(9) the term "relief" means all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements.

18 U.S.C. §§ 3626(g)(1), (5), (6), (7), (9).

 In interpreting a Congressional enactment, we generally assume that the ordinary meaning of language used in the statute accurately expresses Congress's purpose, unless the statute contains a contrary indication. *See, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). If the statute includes an explicit statutory definition, we accord that definition controlling weight, *see, e.g., Meese v. Keene,* 481 U.S. 465, 484, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), even if it varies from common usage, *see, e.g., Western Union Telegraph Co. v. Lenroot,*

323 U.S. 490, 502, 65 S.Ct. 335, 89 L.Ed. 414 (1945).

■ The PLRA's termination provision affects only "prospective relief." In order to determine whether that provision is meant to be applied to consent decrees, therefore, we look to the Act's explicit definition of prospective relief and, as necessary, to the definitions of the terms to which that definition refers. The definition of "prospective relief" does not refer *in haec verba* to consent decrees but states simply that prospective relief is any "relief" other than compensatory monetary damages. The definition of relief, however, expressly "includes consent decrees." 18 U.S.C. § 3626(g)(9). This inclusion is reinforced by the definition of the term "consent decree" itself, which "means [consensual court-ordered] relief." *Id.* § 3626(g)(1). These definitions make it doubly plain that a consent decree, to the extent that it awards a remedy other than compensatory monetary damages, constitutes prospective relief within the meaning of the Act. We thus conclude that the termination provision applies to consent decrees.

The *Benjamin II* panel reached the opposite conclusion principally because the definition of "relief" also expressly excludes "private settlement agreements," an exclusion the panel found superfluous because one does not ordinarily characterize an agreement as relief. We share the panel's view that this is not a natural characterization; nor do we think it entirely natural to characterize a consent decree itself, as contrasted with the decretal provisions it contains, as relief. The awkwardness in this instance does not, however, obscure Congress's intent. In defining relief to exclude private settlement agreements (*i.e.*, agreements that are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled), Congress simply excluded those agreements from the governmental obligations that must be based on need-narrowness-intrusiveness findings, and hence preserved them from termination.

Congress may, of course, choose to formulate its enactments in any of a number of ways. It might, for example, state *in haec verba* that "A, B, C, and D are prohibited." Or it might state simply that "X is prohibited," and define "X" to mean "A, B, C, or D." The scope of both statutory prohibitions would be the same. Congress's selection of the definitional structure for the PLRA, stating that the court must terminate "prospective relief" not supported or supportable by need-narrowness-intrusiveness findings, and defining prospective relief to include consent decrees but to exclude private settlement agreements, is the equivalent of a provision stating that the court is to terminate consent decrees as to which need-narrowness-intrusiveness findings have not been and cannot be made, but it is not to terminate private settlement agreements even if such findings could not be made. We think it clear from the statutory terms distinguishing between consent decrees and private settlement agreements that Congress intended to free governments from judicial constraints not based on need-narrowness-intrusiveness findings, but not to relieve them of their private contractual obligations—however broad—that are not judicially ordered.

We do not see any basis for inferring that Congress meant federal consent decrees that are not based on need-narrowness-intrusiveness findings to remain in effect and amenable to enforcement in state courts. It seems implausible that Congress meant to forbid a federal court to enforce these federal judgments but to allow them to be enforceable in a state court, and the language of the Act is contrary to any suggestion that a decree not supported by the mandated findings is to be allowed to remain in effect. Although the word "termination" is not defined in the Act, its ordinary meaning is the antithesis of continuation.

We also note our disagreement with the *Benjamin II* panel's view that federal consent decrees not supported by the mandated findings remain enforceable in state courts on the theory that settlement agreements are both private agreements and consent decrees. An agreement leading to a consent decree is normally conditional, setting out actions and forbearances to which the defendant agrees and stating that the settlement is conditioned on being so-ordered by the court. *See, e.g., Benjamin v. Malcolm,* 75 Civ. 3073 (S.D.N.Y. Nov. 29, 1978) (Stipulation for Entry of Partial Final Judgment at 1 ("IT IS HEREBY STIPULATED by and between the undersigned attorneys for the plaintiffs and the defendants herein, and *subject to approval by the Court*" (emphasis added))). A plaintiff willing to settle constitutional claims by way of a consent decree seeks the assurance that, if the defendant fails to fulfill its agreed obligations, those obligations will be enforceable through the court's exercise of its contempt power. We are not aware of any practice whereby the plaintiffs, especially in institutional litigation involving constitutional claims for injunctive relief, agree to a consent decree and also agree—either in the same document or in a separate document—to give up their claims unconditionally in exchange for undertakings by the defendants that would not be enforceable except through the commencement of a new lawsuit for breach of contract.

Where the parties have made an agreement to settle conditional on approval by the federal court, there is no enforceable agreement if the condition fails. The parties may of course enter into an agreement that is not conditioned on such approval, but that would be a different agreement from an accord envisioning a consent decree. The court's approval of any judgment, whether litigated or consensual, is of course subject to change if the conditions

underlying the judgment change. *See, e.g., System Federation No. 91, Railway Employes' Department, AFL–CIO v. Wright,* 364 U.S. 642, 647, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) ("*System Federation*") ("court will not continue to exercise its powers [ ]under [a consent decree] when a change in law or facts has made inequitable what was once equitable"); Fed. R.Civ.P. 60(b)(5) ("court may relieve a party ... from a final judgment ... [on a showing that] ... it is no longer equitable that the judgment should have prospective application").* And if the federal court, though having once approved, withdraws its approval and terminates prospective relief, the condition upon which the parties agreed to bind themselves will have failed. In such circumstances, we see no basis, consistent with fundamental principles of contract law or with the Supremacy Clause of the Constitution, on which a state court would have the power to reinstate obligations originally imposed in the federal consent decree but terminated by the federal court.

■ Nor, given the Act's definitions, does it appear that Congress thought federal consent decrees would simultaneously be private settlement agreements. A consent decree is defined as relief "entered by the court," 18 U.S.C. § 3626(g)(1), and it is well established that a federal court ordinarily has the power to enforce its own orders and judgments, *see, e.g., Peacock v. Thomas,* 516 U.S. 349, 356–57, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996); *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). A private settlement agreement, in contrast, is defined as relief that is "not subject to judicial enforcement." 18 U.S.C. § 3626(g)(6). Given these definitions, it appears that Congress sought to make the Act's concepts of consent decrees and private settlement agreements mutually exclusive.

---

* So far as we are aware, none of the consent decrees at issue in the present cases contains any concessions of federal rights by class representatives for the prisoners. If there were such concessions, the district court would have the power to relieve the parties if such concessions became inequitable.

We note also that the Act, in contrasting the treatment to be given to private settlement agreements, specifies that those agreements are enforceable "in State court." *Id.* § 3626(c)(2)(B). The absence of any similar statement indicating state-court enforceability of federal consent decrees reinforces our view that Congress meant the Act to require the termination of consent decrees that are not supportable by need-narrowness-intrusiveness findings and not simply to make such decrees unenforceable by federal courts but enforceable by state courts. Certainly given the goal of relieving governmental entities of judicially ordered burdens that "extend ... further than necessary" to remedy a federal violation, ·*id.* § 3626(a)(1)(A), it ·would seem anomalous for Congress simply to transfer judicial enforcement of unnecessary relief from one forum to another.

In sum, the Act explicitly requires the "immediate termination of any prospective relief" that was approved or granted in the absence of the specified need-narrowness-intrusiveness findings. *Id.* § 3626(b)(2). Since prospective relief, under the set of definitions provided in the Act, includes a consent decree to the extent that the decree does not award compensatory monetary damages, we think it clear from the statute itself that, if those findings were not made in connection with the entry of the decree, *see id.*, and if the court does not proceed to make the requisite findings that prospective relief remains necessary to correct a current and ongoing violation of a federal right, *see* 18 U.S.C.A. § 3626(b)(3) (West Supp.1998), the Act requires the termination of such a consent decree.

Although we view the language of the Act as sufficiently clear not to require resort to legislative history for explanation, *see, e.g., Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (in resolving question of Congress's intent, "we look first to the statutory language and then to the legislative history if the statutory language is unclear"), we note that the history of the Act confirms our interpretation that the Act calls for the termination of consent decrees that lack the requisite need-narrowness-intrusiveness foundation. A Congressional conference report describing the termination provision of a predecessor bill that was virtually identical to the termination provision that was eventually included in the PLRA stated that *"[p]rior consent decrees are made terminable* upon the motion of either party, and can be continued only if the court finds that the imposed relief is necessary to correct the violation of the federal right."* H.R. Conf. Rep. No. 104–378, at 166 (1995) (emphasis added). Similarly, an earlier predecessor bill, H.R. 667, 104th Cong. (1995), would have required the immediate termination of any prospective relief and defined "relief" to include consent decrees. The House of Representatives Judiciary Committee Report on H.R. 667 stated that the termination provision "allows a jurisdiction that is already subject to an existing federal consent decree that was entered with no finding of any constitutional violation, to move to *terminate that decree."* H.R.Rep. No. 104–21, at 26 (1995) ("House Report") (emphasis added). The House ˌReport also explained that the relevant section would

> limit[ ] the remedial scheme a court may order or approve to the least intrusive remedy .... [and would] reasonably and permissibly limit[ ] the use of court-enforced consent decrees to resolve prison conditions suits, while freely allowing the use of private settlement agreements.

*Id.* at 24–25.

In sum, we agree with the conclusions of the First Circuit in *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649 (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998), that although the definition of consent decrees as "relief" "contradicts conventional" usage, the Act, when "[r]ead literally, ... requires termination of the consent decree

itself," *id.* at 654, and that the language of the Act, read literally, accurately reflects the intent of Congress. Accordingly, we reject the *Benjamin II* panel's view that the Act does not require that consent decrees unsupportable by need-narrowness-intrusiveness findings be terminated.

## B. *The Meaning of "Termination"*

■ We also, however, reject the view of the district court that, if a consent decree was entered without the requisite need-narrowness-intrusiveness findings, the Act requires that the decree be vacated. The Act states that such decrees are to be "terminat[ed]"; it does not speak of vacatur or use the term "vacate." There is a potentially significant difference between the terms, and we see no basis for assuming that Congress thought the two interchangeable. As the First Circuit observed,

> Nothing in the PLRA or its legislative history speaks of vacating consent decrees. Congress chose to use the verb "terminate" and to eschew the verb "vacate." The distinction between these two words is clear: "terminate" means "to put an end to" or "to end," *Black's Law Dictionary* at 1471 [ (6th ed.1990) ], whereas "vacate" means "to annul" or "to render ... void," *id.* at 1548.
>
> In the present context, this distinction may well possess practical significance.... While terminating a consent decree strips it of future potency, the decree's past puissance is preserved and certain of its collateral effects may endure. Vacating a consent decree, however, wipes the slate clean, not only rendering the decree sterile for future purposes, but also eviscerating any collateral effects and, indeed, casting a shadow on past actions taken under the decree's imprimatur.... [N]othing in the PLRA even hints that consent decrees must be vacated when prospective relief is terminated....

*Inmates of Suffolk County Jail v. Rouse,* 129 F.3d at 662.

We likewise see no indication in the Act itself or in its legislative history that Congress meant past consent decrees to be annulled and stripped of all past significance or collateral effect. Accordingly, we conclude that the Act requires only that consent decrees not supportable by need-narrowness-intrusiveness findings be terminated, not vacated.

## III. THE CONSTITUTIONAL CHALLENGES

Plaintiffs contend that when the Act is read to require termination of consent decrees, it is unconstitutional in several respects. They contend principally that the termination provision violates the separation of powers principle of the Constitution by requiring the courts to reopen final judgments and violates Article III by stripping the courts of their power and duty to fashion adequate remedies in constitutional cases. We note that plaintiffs have not, in this *en banc* rehearing, renewed their contention that the termination provision violates the principle enunciated in *United States v. Klein;* accordingly, that contention is no longer before this Court. Plaintiffs also argue that the application of the Act's termination provision to the Decrees would violate their rights to due process and equal protection. We reject all of their contentions.

## A. *Separation of Powers*

■ The Constitutional principle of separation of powers protects each of the three Branches of the federal government from encroachment by either of the other Branches. Article III of the Constitution "establishes a 'judicial department' with the 'province and duty ... to say what the law is' in particular cases and controversies." *Plaut,* 514 U.S. at 218, 115 S.Ct. 1447 (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). The separation of powers "serves both to protect the role of the independent judiciary within the constitutional scheme of tri-

partite government, ... and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (internal quotation marks omitted).

In *Plaut,* the Supreme Court established that one facet of the separation of powers principle prevents Congress from requiring the courts to reopen final judgments. At issue in *Plaut* was a then-recently-enacted statutory provision dealing with statutes of limitations in civil actions brought to enforce the federal securities laws. The *Plaut* plaintiffs had previously commenced a federal securities fraud action seeking money damages; when commenced, their action was timely under the then-applicable statute of limitations. While their suit was pending, however, the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), ruled that such actions were subject to a shorter limitations period. Under that ruling, the *Plaut* plaintiffs' claims were dismissed as time-barred; the plaintiffs did not appeal, and the judgment dismissing their case became final. Thereafter, Congress passed a statute purporting to reinstate actions that had been dismissed under *Lampf* but that would have been timely had the prior limitations period been applied.

The Court ruled that because the dismissal of the *Plaut* plaintiffs' action had become final before the new legislation went into effect, Congress had "exceeded its authority by requiring the federal courts to exercise [t]he judicial Power ... in a manner repugnant to the text, structure and traditions of Article III." *Plaut,* 514 U.S. at 217–18, 115 S.Ct. 1447 (internal quotation marks omitted). The Court stated that Article III

> gives the Federal Judiciary the power, not merely to rule on cases, but to de-

cide them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that "a judgment conclusively resolves the case" because "a 'judicial Power' is one to render dispositive judgments." Easterbrook, Presidential Review, 40 Case W.Res.L.Rev. 905, 926 (1990). By retroactively commanding the federal courts to reopen final judgments, Congress ... violate[s] this fundamental principle.

*Plaut,* 514 U.S. at 218–19, 115 S.Ct. 1447.

> Having achieved finality, ... a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was.

*Id.* at 227, 115 S.Ct. 1447 (emphasis in original).

"Finality," however, may be defined differently for different purposes, and the *Plaut* Court distinguished the judgment at issue before it, which dismissed a complaint seeking money damages, from other types of judgments. Making particular reference to the decision in *Pennsylvania v. Wheeling and Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855) ("*Wheeling Bridge II*"), see also *Pennsylvania v. Wheeling and Belmont Bridge Co.,* 54 U.S. (13 How.) 518, 14 L.Ed. 249 (1851) ("*Wheeling Bridge I*"), the *Plaut* Court noted that a separation of powers contention had been rejected to the extent that challenged legislation had "altered the prospective effect of injunctions," 514 U.S. at 232, 115 S.Ct. 1447. In *Wheeling Bridge I,* the Supreme Court had ruled that a bridge across the Ohio River was so low as to obstruct navigation, in violation of then-existing federal law, and the Court entered an injunction ordering the bridge elevated or abated. *See Wheeling Bridge I,* 54 U.S. (13 How.) at 521, 626. Thereafter, Congress enacted a statute declaring

the bridge a lawful structure, designating it a post-road for carriage of the mails, and authorizing the bridge's owner to maintain the bridge at its then-present height. Subsequently, after the bridge had been destroyed by a storm, Pennsylvania sought to enjoin reconstruction of the bridge at the same height, arguing that the statute legalizing the bridge was unconstitutional because it "ha[d] the effect and operation to annul the judgment of the court already entered, or the rights determined thereby." *Wheeling Bridge II*, 59 U.S. (18 How.) at 431.

.The *Wheeling Bridge II* Court noted that had its prior judgment been a judgment for money damages, Pennsylvania's contention would have had merit (and indeed did have merit insofar as the prior judgment had awarded costs), for the judgment would have been final within the meaning of the separation of powers principle and could not have been altered by an Act of Congress. *See id.* ("if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress."). However, to the extent that *Wheeling Bridge I* granted forward-looking injunctive relief, the *Wheeling Bridge II* Court ruled that the judgment was "executory" rather than final, and thus its enforcement could be prevented by Congress:

> [T]hat part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction ˙ or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain

the decree of the court cannot be enforced.

*Wheeling Bridge II*, 59 U.S. (18 How.) at 431–32.

▪▪▪▪ The *Plaut* Court observed that cases such as *Wheeling Bridge II* "distinguish themselves" from *Plaut*, 514 U.S. at 232, 115 S.Ct. 1447, which involved only requests for monetary relief. The *Plaut* Court stated that nothing in its holding called into question the principle established in *Wheeling Bridge II*, that legislation does not violate the separation of powers by "alter[ing] the prospective effect of injunctions." *Plaut*, 514 U.S. at 232, 115 S.Ct. 1447. We understand the parameters drawn by *Plaut* and *Wheeling Bridge II* to be as follows: Under the separation of powers, Congress lacks the authority to alter a finally rendered judgment ordering the payment of money. On the other hand, to the extent that a court's final judgment consists of an injunction, Congress may require alteration or termination of its future effect if the law on which the injunction was predicated has been changed. Those conditions are satisfied here. By statute Congress has altered the courts' remedial powers so that, in this class of cases, injunctions may not be issued if they are not constitutionally mandated. Congress may accordingly require the termination of the executory portions of injunctions that exceed the courts' present remedial powers.

▪▪▪ The proposition that a court has the authority to alter the prospective effect of an injunction in light of changes in the law or the circumstances is, of course, well established. *See, e.g., System Federation*, 364 U.S. at 646–47, 81 S.Ct. 368; *United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 76 L.Ed. 999 (1932) ("*Swift* "); *Chrysler Corp. v. United States*, 316 U.S. 556, 562, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942); *Wheeling Bridge II*, 59 U.S. (18 How.) at 431–32. "The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a

continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *System Federation*, 364 U.S. at 647, 81 S.Ct. 368. Further, that authority extends to injunctions entered on consent of the parties. "[T]he power of a court of equity to modify an injunction in adaptation to changed conditions," even though the injunction "was entered by consent," is "inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Swift*, 286 U.S. at 114, 52 S.Ct. 460. *See also Agostini v. Felton*, 521 U.S. 203, ——, 117 S.Ct. 1997, 2006, 138 L.Ed.2d 391 (1997) ("A court errs when it refuses to modify an injunction or consent decree in light of [statutory or decisional law] changes."); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (consent decree may be reopened "to the extent that equity requires"); *System Federation*, 364 U.S. at 651, 81 S.Ct. 368; *Western Union Telegraph Co. v. International Brotherhood of Electrical Workers*, 133 F.2d 955, 957 (7th Cir.1943) ("though a decree may be final as it relates to an appeal ..., yet, where the proceedings are of a continuing nature, it is not final, ... and the injunction will be vacated ... where the law has been changed").

In *System Federation*, for example, a consent decree enjoined a railroad and several unions from discriminating against the railroad's nonunion employees because of their nonunion status. At the time the decree was entered, a federal statute made such discrimination unlawful. Six years later, however, Congress amended the statute to allow collective bargaining agreements permitting an employer to require union membership as a condition of employment, and the unions asked the district court to modify the decree to make it clear that the injunction against such conditions was thenceforth to "have no prospective application." *System Federation*, 364 U.S. at 645, 81 S.Ct. 368 (internal quotation marks omitted). The district court "acknowledged its authority to modify the consent decree but declined to do so, primarily out of regard for the fact that the unions ... had consented ... [to] an undertaking which the District Court considered was not unlawful either before or after the ... amendments." *Id.* The court of appeals affirmed, but the Supreme Court reversed. Refusing "to recede from" the "principles of the *Wheeling Bridge* case," 364 U.S. at 650, 81 S.Ct. 368, the *System Federation* Court noted that when the underlying law governing the conduct of the parties has been altered, the court has the power to dissolve the injunction, even "though it was entered by consent,'" *id.* at 647, 81 S.Ct. 368 (quoting *Swift*, 286 U.S. at 114, 52 S.Ct. 460), in order to avoid "render[ing] protection in no way authorized by the needs of safeguarding statutory rights," *System Federation*, 364 U.S. at 648, 81 S.Ct. 368.

Given the inherent power of the courts to modify or terminate forward-looking injunctive provisions in light of changes in law or circumstances, and given the distinction drawn by the *Plaut* Court between monetary judgments and judgments granting prospective injunctive relief, we conclude that plaintiffs' separation of powers challenge to the PLRA's termination provision must be rejected. Section 3626(b)(2) does not require the termination of any relief other than prospective relief, and the definition of prospective relief expressly excludes compensatory monetary damages. Thus, the PLRA does not seek retroactively to revise past adjudications by the Judicial Branch that had become "final" within the meaning of *Plaut*.

Most of our sister Circuits that have considered this question have also reached the conclusion we reach here today. *See, e.g., Hadix v. Johnson*, 133 F.3d 940, 942–43 (6th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 118 S.Ct. 2368, 141 L.Ed.2d 737 (1998); *Dougan v. Singletary*, 129 F.3d 1424, 1426 (11th Cir.1997) (per curiam),

*cert. denied*, —— U.S. ——, 118 S.Ct. 2375, 141 L.Ed.2d 743 (1998); *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d at 656–57; *Gavin v. Branstad*, 122 F.3d 1081, 1089 (8th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2374, 141 L.Ed.2d 741 (1998); *Plyler v. Moore*, 100 F.3d 365, 371–72 (4th Cir.1996), *cert. denied*, 520 U.S. 1277, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997). The only contrary court of appeals opinion of which we are aware, issued by a panel of the Ninth Circuit, was withdrawn by that court in connection with its granting of rehearing *en banc*. *See Taylor v. United States*, 143 F.3d 1178 (9th Cir.), *petition for rehearing granted, and panel opinion withdrawn*, 158 F.3d 1059 (9th Cir.1998) (en banc).

■ For the reasons discussed above, we share the majority view that the Act's requirement for the termination of prospective relief, where that relief is not and cannot be supported by need-narrowness-intrusiveness findings, does not violate the finality ** principle of separation of powers.

### B. *Interference With Article III Power*

■ Nor is there merit in plaintiffs' contention that the PLRA's provision for termination of consent decrees strips the courts of their Article III power and duty to remedy constitutional wrongs, for the Act neither alters the scope of substantive rights nor limits the type of relief that may be ordered if that relief is necessary to redress violations of those rights. Rather, the Act forbids forward-looking relief in excess of what the court finds is necessary. Congress's power to limit the remedial authority of the federal courts, which is grounded in its power to "ordain and establish" inferior federal courts, U.S. Const. Art. III, § 1, is well established. *See, e.g., Hanna v. Plumer*, 380 U.S. 460, 472–73, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Sibbach v. Wilson & Co.*, 312 U.S. 1, 9, 61 S.Ct. 422,

85 L.Ed. 479 (1941). Congress may, for example, establish substantive and procedural prerequisites to the granting of specific types of relief, *see, e.g., Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 329–30, 58 S.Ct. 578, 82 L.Ed. 872 (1938) (certain statutorily-specified findings required before court may issue injunction in labor dispute); or give one court exclusive jurisdiction to enjoin the operation of a particular statutory scheme, *see Lockerty v. Phillips*, 319 U.S. 182, 187–88, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943); or bar all federal courts from enjoining the collection of state taxes so long as adequate remedies are available in state court, *see California v. Grace Brethren Church*, 457 U.S. 393, 407–08, 411, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982). *See also Yakus v. United States*, 321 U.S. 414, 442 n. 8, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (listing "other instances in which Congress has regulated and restricted the power of the federal courts to grant injunctions").

In the PLRA, Congress has neither defined nor altered the federal rights that may be vindicated in prisoner litigation. Nor has it forbidden the court, if it finds a violation of federal right, to order or enforce such relief as the court finds is needed to remedy the violation of that right. The Act's termination provision simply forbids the continuation of prospective relief that exceeds what is needed to remedy a continuing violation of the federal right. Existing consent decrees may have ordered, without adjudication of the merits of the plaintiffs' claims or without adjudication of the appropriate scope of the remedy for a proven federal violation, more relief than was needed to remedy the violations. The Act's elimination of the parties' ability to obtain judicial enforcement of the forward-looking provisions of a judgment obtained without such adjudications neither affects the court's power " 'to say what the law is' in particular cases and

---

** As indicated earlier, we do not address the limitation on Congressional power to prescribe a rule of decision, enunciated in *United*

*States v. Klein*, since plaintiffs have not argued that issue to the en banc court.

controversies," *Plaut,* 514 U.S. at 218, 115 S.Ct. 1447 (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) at 177), nor infringes "litigants' right to have claims decided before judges who are free from potential domination by other branches of government," *Commodity Futures Trading Commission v. Schor,* 478 U.S. at 848, 106 S.Ct. 3245 (internal quotation marks omitted). The court remains authorized to adjudicate the controversies before it and to order such relief as is necessary to remedy the federal violations it finds established. We conclude that the Act does not represent an abrogation of Article III power.

### C. *Due Process and Equal Protection*

■ Plaintiffs' remaining constitutional contentions do not require extended discussion. Their principal due process contention is that the termination provision deprives them of vested contractual rights. As discussed in Part III.A. above, however, the provisions of a consent decree that order prospective relief remain subject to modification or alteration for changes in law or circumstances. Such right as a litigant may have to prospective relief is thus neither final nor "vested" in the constitutional sense.

■ Further, as the *System Federation* Court noted, a court considering whether modification of a consent decree is warranted is not bound by principles of contract:

> "We reject the argument ... that a decree entered upon consent is to be treated as a contract and not as a judicial act.... [I]n truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be."

364 U.S. at 651, 81 S.Ct. 368 (quoting *Swift,* 286 U.S. at 114–15, 52 S.Ct. 460). The *System Federation* Court stated that "[t]he parties cannot, by giving each other

consideration, purchase from a court of equity a continuing injunction." 364 U.S. at 651, 81 S.Ct. 368.

We conclude that plaintiffs' due process contentions were properly rejected. *Accord Dougan v. Singletary,* 129 F.3d at 1426–27 ("a decree, unlike a money judgment, is subject to later adaptation to changing conditions. Legislative modification of the law governing the decree thus does not impermissibly divest the inmates of any vested rights"); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d at 658 ("modifiable decrees cannot create vested rights"); *Gavin v. Branstad,* 122 F.3d at 1091 ("a judgment that is not final for purposes of the separation of powers is also not final for purposes of due process").

■ Plaintiffs' equal protection argument is principally that the PLRA burdens the right of access to courts and thus warrants "strict scrutiny." The right of access to courts is indeed fundamental, *see, e.g., Lewis v. Casey,* 518 U.S. 343, 350–51, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 578–80, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), but the termination provision does not impair that right. As discussed in Part III.B. above, nothing in the Act alters plaintiffs' federal rights or prevents the court from granting such relief as is necessary to remedy violations of those rights. Plaintiffs remain free to seek an adjudication that their federal rights are being violated and to secure the relief necessary to remedy such federal violations as they establish. Further, under the Act, existing provisions for prospective relief designed to remedy violations of those rights are not to be terminated where the need-narrowness-intrusiveness findings can be made with respect to the continuation of such relief. *See* 18 U.S.C.A. § 3626(b)(3) (West Supp.1998). Thus, plaintiffs' fundamental right of access to the courts is not

burdened. *Accord Inmates of Suffolk County Jail v. Rouse,* 129 F.3d at 660 ("[u]nder the PLRA, the courthouse doors remain open and the withdrawal of prospective relief—above and beyond what is necessary to correct the violation of federally protected rights—does not diminish the right of access"); *Gavin v. Branstad,* 122 F.3d at 1090 ("[t]he right to enforce a consent decree that goes beyond the bounds of constitutional necessity is not equivalent to the right to bring constitutional grievances to the attention of the courts"); *Plyler v. Moore,* 100 F.3d at 373 ("[s]imply put, the Inmates have confused the right of access to the courts with the scope of the available substantive relief").

▇▇▇ Since no fundamental right is burdened, and prisoners are not a suspect class, strict scrutiny of the Act is not warranted. Plaintiffs' equal protection claim must thus be rejected "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (internal quotation marks omitted). Under this standard, the burden is on the person challenging the legislation "to negative every conceivable basis which might support it, ... whether or not the basis has a foundation in the record." *Id.* at 320–21, 113 S.Ct. 2637 (internal quotation marks omitted). Plaintiffs fall far short of meeting their burden. The terms and legislative history of the Act make it clear that, in the unique context of litigation challenging prison conditions, *see generally Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), Congress adopted the remedial and termination provisions in order to promote, *inter alia,* principles of federalism and judicial restraint. The objective of limiting the grant or continuation of prospective relief in this context to no more than what is found necessary to remedy the violation of a federal right is unquestion-

ably a legitimate one. *Accord Inmates of Suffolk County Jail v. Rouse,* 129 F.3d at 660; *Dougan v. Singletary,* 129 F.3d at 1427; *Gavin v. Branstad,* 122 F.3d at 1090; *Plyler v. Moore,* 100 F.3d at 374.

## IV. PROCEEDINGS ON REMAND

▇▇▇ As indicated in Part II above, we have concluded that the Act requires the termination of consent decrees providing for prospective relief entered without the requisite need-narrowness-intrusiveness findings, but that it does not require the annulment or vacatur of those decrees. Accordingly, we reverse so much of the order of the district court as vacated the Decrees at issue here.

Further, as noted in Part I.A. above, the Act contains a "LIMITATION" on the immediate termination requirement, which provides that

*[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right,* extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C.A. § 3626(b)(3) (West Supp.1998) (emphasis added). Although § 3626(b)(2) uses the phrase *"immediate* termination" of prospective relief where there have been no need-narrowness-intrusiveness findings (emphasis added), at least two aspects of that subsection, read in conjunction with the "LIMITATION" subsection that follows it, persuade us that the word "immediate" was not intended to mean without any time intervening between motion and termination.

▇▇▇ First, although the termination provision presupposes the absence of need-narrowness-intrusiveness findings, the "LIMITATION" subsection provides that prospective relief "shall not terminate" if the court makes the requisite written

need-narrowness-intrusiveness findings; presumably such written findings cannot be made instantaneously upon the motion by a defendant for termination of a decree. Hence, Congress must have intended that there be some interval during which the requisite findings could be made. Second, the findings envisioned by the "LIMITATION" subsection must be "based on the record" and must state that prospective relief is "necessary to correct a current and ongoing violation of the Federal right." Evidence presented at a prior time, however, could not show a violation that is "current and ongoing." Hence, the "record" referred to cannot mean the prior record but must mean a record reflecting conditions as of the time termination is sought. In sum, we interpret §§ 3626(b)(2) and (3), read together, to mean that, when the plaintiffs so request in response to a defendant's motion for termination, the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights.

In the present case, plaintiffs asked the district court to allow them an opportunity to present evidence of such current and ongoing violations and of the need for continuation of the prospective relief provided in the Decrees. We conclude that plaintiffs should have been given that opportunity. Accordingly, we remand for further proceedings.

The Act provides that a motion for immediate termination of prospective relief pursuant to § 3626(b)(2) operates to stay such relief beginning on the 30th day after such a motion, see 18 U.S.C.A. § 3626(e)(2) (West Supp.1998). The Act also allows the district court to postpone the automatic stay for 60 additional days for good cause other than general calendar congestion. *Id.* § 3626(e)(3). Since the district court here did not allow plaintiffs to make a record with respect to the need for a continuation of prospective relief, we instruct that the 30–day period prior to the commencement of the automatic stay is to be deemed to begin on the day following the issuance of our mandate herein.

Plaintiffs have also argued that the above 30– and 60–day periods are insufficient to give them a meaningful opportunity to make a record as to the need for continuation of prospective relief and hence constitute a denial of due process. We regard any challenge at this time to the constitutionality of the automatic stay provision as premature, and we decline to address it on this appeal.

Plaintiffs have also requested that this Court extend the stays we have previously entered during the pendency of this appeal, in order to keep the Consent Decrees in place until the proceedings on remand have been completed. In light of our reversal of the district court's order vacating the Decrees, we regard our prior stays as moot, and we decline to extend them further. Our current stay will be vacated upon the issuance of the mandate.

## CONCLUSION

We have considered all of plaintiffs' arguments that are properly before us on this *en banc* rehearing and, except as indicated above, have found them to be without merit. We conclude (a) that the PLRA permissibly provides for the termination of forward-looking provisions of consent decrees in the absence of the need-narrowness-intrusiveness findings required by the Act, but does not provide for vacatur of those decrees; and (b) that plaintiffs should have been given an opportunity to present evidence showing the need for continuation of prospective relief.

The opinion of the panel is vacated. The current stay granted by this Court is terminated. The order of the district court is affirmed insofar as it upheld the constitutionality of § 3626(b)(2), and is reversed insofar is it vacated the Consent Decrees, and the matter is remanded for further proceedings not inconsistent with this opinion.

JACOBS, Circuit Judge (with whom WINTER, Chief Judge, and KEARSE, WALKER, McLAUGHLIN, CABRANES, and PARKER, Circuit Judges, join), concurring:

I write separately to respond to Judge Leval's concurring opinion, which (i) addresses the passage in the Court's in banc opinion that explains why consent decrees are not contracts subject to state-court enforcement (Majority Opinion at 156–57), and (ii) characterizes that passage as unjustified dictum. For the following reason, I think that the passage is needed and useful.

In testing the constitutionality of the PLRA's "termination of prospective relief" provision (18 U.S.C. § 3626(b)), the Panel opinion intimated that the provision might fail if it were read to require the termination of the consent decrees. *See Benjamin II,* 124 F.3d 162, 176–77 (2d Cir.1997). The Panel opinion avoided that risk by reading the provision solely as a limit on the power of federal courts to enforce the consent decrees, and by holding therefore that the consent decrees are not terminated (or vacated) and may be enforceable as contracts in the state courts. *Id.* The Panel opinion justified its course on the perfectly sound principle that courts should avoid making unnecessary constitutional pronouncements if a reasonable interpretation of the statute would obviate the constitutional difficulties. *See Lo Duca v. United States,* 93 F.3d 1100, 1110 (2d Cir. 1996) ("[W]e are instructed to construe federal statutes to avoid constitutional infirmity. . . ."). Only by invoking this doctrine did the Panel opinion avoid reaching certain of plaintiffs' separation of powers, due process, and equal protection arguments. *Benjamin II,* 124 F.3d at 176–77, 177 n. 18.

The Court's in banc opinion reaches and decides the questions that the Panel avoided. *See* Majority Opinion at 157 ("We do not see any basis for inferring that Congress meant federal consent decrees that are not based on need-narrowness-intru-

siveness findings to remain in effect and amenable to enforcement in state courts."). Therefore, it becomes a natural and integral part of the in banc Court's analysis to say why we are reaching tough constitutional issues that we should avoid if we can, that is, why the detour taken by the Panel opinion is foreclosed. To do that, the Court's in banc opinion demonstrates that the consent decrees are not in the nature of contracts that remain subject to enforcement and administration in the state courts.

Judge Leval's concurring opinion argues that because the Court's in banc opinion vacates the Panel opinion, there is no need to address the reason given by the Panel for avoiding the tough constitutional question. I disagree. The Panel opinion is vacated, not annihilated. Because we vacate it, we should say why, and explain our course, including why we reach questions that might be avoided if the consent decrees were contractual in character. The resulting passage in the Court's in banc opinion is not a core holding, but neither is it dictum, let alone dictum that is "advisory" and "gratuitous." *See* Leval Concurring Opinion at 168, 170.

LEVAL, Circuit Judge (with whom Judge OAKES concurs, and Judge CALABRESI concurs as to Part II) concurring in part:

With one reservation outlined below, I join in the majority's opinion.

I. In civil actions relating to prison conditions ("prison litigation"), the Prison Litigation Reform Act ("PLRA") grants the defendant the right to immediate termination of the prospective effect of injunctions to the extent their mandates do not meet the statute's need-narrowness-intrusiveness test. *See* 18 U.S.C. § 3626(b)(2). The plaintiffs contend that a congressional enactment requiring such termination undoes the judgment of a federal court and thereby violates the Constitution's separation of powers.

Although Congress has indeed required the alteration of a federal court's judgment, it has done so in a permissible manner. In § 3626(a), Congress limits the power of the courts to grant prospective relief in prison litigation to circumstances that satisfy the need-narrowness-intrusiveness test. Subsection (c)(1) further provides that a "court shall not enter or approve a consent decree" unless the decree satisfies the same test. Under subsection (b)(2), previously-entered consent decrees are terminable if they do not meet the need-narrowness-intrusiveness test. Because subsection (c)(1)'s limitation on the courts' remedial powers and subsection (b)(2)'s provision for termination turn on the identical test, courts today would lack the power to enter the consent decrees that are terminable. All Congress has done in § 3626(b)(2), then, is to bar the courts from continuing to enforce previously entered injunctions of the kind they now lack the power to command.

As I understand it, the Supreme Court's opinion in *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. 421, 18 How. 421, 15 L.Ed. 435 (1855) (*"Wheeling Bridge II"*), holds that a congressional interference with a federal court's judgment in such circumstances does not infringe the separation of powers. In an earlier case, *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 54 U.S. 518, 578, 13 How. 518, 14 L.Ed. 249 (1851) (*"Wheeling Bridge I"*), the Supreme Court had ordered a bridge raised or removed because it was a public nuisance that impeded navigation. Congress, however, then passed legislation designating the bridge a post-road. *See Wheeling Bridge II,* 59 U.S. (18 How.) at 429. Because, as a matter of law, a congressionally-designated post-road could not be adjudged a public nuisance, the Court was no longer empowered to order the abatement it had mandated in *Wheeling Bridge I.* The Supreme Court thus ruled in *Wheeling Bridge II* that Congress could lawfully require termination of the prospective effect of the earlier injunc-

tion. *See Wheeling Bridge II,* 59 U.S. (18 How.) at 431–32, 436.

I understand *Wheeling Bridge II* to support the proposition that, where a federal court's injunction has ongoing, prospective effect, and Congress modifies the law upon which it was predicated so that the court is no longer empowered to issue such an order, Congress may give the defendant the right to the termination of the injunction. In this case, Congress has done just that.

I join in the portion of the majority opinion that so rules, as well as in its rejection of the plaintiffs' contentions that § 3626(b)(2) violates constitutional principles of equal protection and due process.

II. I do not join in Part IIA of the majority's opinion. The panel opinion had expressed views that, once the consent decrees were terminated, the plaintiffs would continue to have contract rights arising from the settlement agreements that underlay the consent decrees, and that the plaintiffs might enforce those contract rights in state courts. The *in banc* majority opinion disagrees. It asserts first that the settlement agreements underlying the consent decrees cannot stand as enforceable contracts once the consent decrees are vacated; it then adds that, in any event, the PLRA does not tolerate the survival of such contract rights.

I express neither agreement nor disagreement with these views. In my view, those issues are simply not before us. The issues on which the parties have sought our ruling are whether § 3626(b)(2) requires termination of consent decrees that do not comply with the need-narrowness-intrusiveness test, and whether such termination comports with the Constitution. We answer each of those questions in the affirmative.

But neither we nor the district court have been asked to adjudicate whether, after the termination of the consent decrees, prisoners may bring contract actions in state courts predicated on the settle-

ment agreements that underlie the consent decrees. The majority's views on that question play no role whatsoever in supporting the conclusions it reaches on the issues that are before us. The proposition that plaintiffs would be barred, after the termination of the consent decrees, from enforcing contract rights is not part of the reasoning that leads us to conclude the decrees must be terminated. The entire discussion is dictum. These are advisory views that have no legal force.

I assume the majority has included the discussion because of its strong disagreement with the contrary views stated in the panel's opinion. But we have vacated the panel's opinion and have substituted the opinion of the *in banc* court. The panel opinion no longer stands as an opinion of the Second Circuit. If a majority of the court feels a need to make clear that it does not endorse the views expressed in the panel opinion, it could simply say so. I do not understand why disagreement with a vacated panel opinion justifies our undertaking to adjudicate an issue not presented in this litigation.

I do not mean to imply that the discussion should necessarily be omitted because it is advisory. I recognize that in well-chosen instances, advisory discussion in a court opinion can serve a useful purpose. My greater concern is that the majority seems to present the discussion as a holding. A reader of the majority opinion, who did not take care to compare this discussion with the relief granted, might easily conclude that the Second Circuit has adjudicated this question. We have done no such thing, and in fact have no power to do

so in a case that does not put that question before us.

To avoid confusion as to the state of the law, courts have an obligation when they indulge in advisory discussion to identify it as such. A court's holding, including the reasoning underlying it, has the force of law. Within the sphere of that court's authority, the public and subservient courts are legally bound to follow its ruling. On the other hand, dictum—even when uttered by the highest court in the land—has no legal force. A court's power to make law derives solely from its obligation to decide cases, and extends no further than the reasoning that underlies the judgment. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821) (Marshall, C.J.) ("It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").[1] Thus, while dictum may help observers to predict how the law may develop if and when the court eventually rules on a question, it does not have the force of law. No one is legally obligated to follow it.

If litigants or courts come to consider in the future whether state law contract rights survive the termination of the consent decrees under the PLRA's § 3636(b)(2), they should recognize that the Second Circuit has not adjudicated that question. It has merely expressed

---

1. The Supreme Court recognized that its power to "say what the law is" extends solely to properly presented cases and controversies as early as 1793. Responding to a written request from Secretary of State Thomas Jefferson on behalf of President Washington seeking advice on legal questions arising from treaties between the United States and France, the Justices wrote President Washington a letter stating in part that "[t]he lines of separation drawn by the Constitution between the three departments of the government—their being in certain respects checks upon each other—and our being judges of a court in the last resort—are considerations which afford strong arguments against the propriety of our extrajudicially deciding the questions alluded to." Letter from the Justices to George Washington (Aug. 8, 1793), *reprinted in Hart & Wechsler's The Federal Courts and the Federal System* 93 (Richard H. Fallon et al. eds., 4th ed. 1996).

advisory views that may or may not be found persuasive.[2]

\* \* \*

In response to this opinion, Judge Jacobs, joined by a majority of the court, asserts that the majority's rejection of the survival of contract rights "is not a core holding, but neither is it dictum, let.alone dictum that is 'advisory' and 'gratuitous.'" He asserts that the passage is "needed and useful." (Judge Jacobs stops short of ever directly asserting that the discussion is a "holding." Perhaps that omission is intentional.)

I think it reasonable for Judge Jacobs to insist that the discussion is "useful." The discussion expresses my colleagues' disagreement with the panel on an issue that is likely to arise. The publication of such a debate may well be useful. When the question arises in litigation, the judges charged with deciding whether the PLRA tolerates or forbids the survival of contract rights may well benefit from the airing of the views of the Second Circuit's judges. My main concern, as stated above, is not with my colleagues' expression of their views, but with presentation in a manner that makes it appear to be a holding, having the force of law.

Judge Jacobs seems to argue that the majority's interpretation of the PLRA as forbidding, rather than tolerating, the survival of contract rights is not merely advisory. His argument is ingenious and requires careful attention.

He tacitly concedes that the court is not granting relief that depends on a finding that the PLRA forbids the survival of contract rights. Nonetheless, he argues as follows:

1. We consider and uphold the constitutionality of the statute on the assumption that it forbids the survival of contract rights.

2. We do this in the face of a prudential principle that counsels against adjudicating constitutional problems if they can be reasonably avoided.

3. Under this principle we cannot justify resolving the constitutional question in step 1 if the PLRA can plausibly be interpreted to allow for the survival of contract rights (as that interpretation would obviate the constitutional inquiry).

4. We therefore consider whether the PLRA may reasonably be construed to tolerate the survival of contract rights and conclude that it may not.

5. Ergo, Judge Jacobs concludes, our decision that contract rights do not survive the termination of the consent decrees is not merely advisory, albeit not a "core holding."

Judge Jacobs's explanation flows elegantly from step 1 to step 5. The principal problem is that step 1 is gratuitous.[3] We have no occasion to consider the question whether the PLRA passes constitutional muster if construed to extinguish contract rights. No one has asked us to rule on whether contract rights survive the termination of the decrees. And our decision requiring the termination of the decrees,

---

**2.** See Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 190 (3d Cir.1999) ("If the Inmates have valid contractual claims that survive termination [of consent decrees under the PLRA], such claims are based solely upon ... Pennsylvania law, and are not affected by the PLRA. 18 U.S.C. § 3626(d) ("The limitations on remedies in this section shall not apply to relief entered by a State court based solely upon claims arising under State law."). The Inmates are therefore free to pursue relief in the Pennsylvania courts. It is not our province to speak to the validity of any claims arising under Pennsylvania law, or to award relief therefor.") (internal quotation marks, citations, and brackets omitted).

**3.** In addition, the principle on which Judge Jacobs relies in step 2 counsels avoidance of constitutional issues only when they present serious problems. See Almendarez–Torres v. United States, 523 U.S. 224, ——, 118 S.Ct. 1219, 1228, 140 L.Ed.2d 350 (1998). The majority opinion finds no serious constitutional problem in upholding the statute on the assumption that it bars survival of contract rights.

the issue we are required to adjudicate, would be the same regardless whether the PLRA tolerates or forbids the survival of contract rights following the termination.

Judge Jacobs offers a second reason why the discussion is not advisory, which is that "[t]he Panel opinion is vacated, not annihilated." In other words, people can still read it, and be influenced by its ideas. If we disagree with it we should say so and explain why we have vacated it.

Once again, the majority's desire to disavow the views asserted in the panel's opinion may well justify the discussion, but that does not make it a holding. Whether a discussion is holding or dictum depends on its relationship to the relief the court renders, not on its relationship to the pronouncements of other judges in the prior history of the case. Until we are asked to rule on the survival of contract rights, our views of those competing interpretations of the PLRA are advisory.

Even if the majority were to insist explicitly that the passage is not a dictum, but a holding, that would not make it so. That is because a court's power to make law derives solely from its obligation to decide the disputes before it. As Judge Friendly explained in *United States v. Rubin*, 609 F.2d 51, 69 (2d Cir.1979) (Friendly, J. concurring), "A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold.' "

I join in the adjudicatory portion of the majority's opinion, but not in Part IIA.

CALABRESI, Circuit Judge, concurring in the result:

The court today does violence to two fundamental—and conservative—principles of our Constitution: Separation of Powers and Federalism. It does the first to no purpose whatsoever; it does the second needlessly, by reaching out to express views on an issue that is not yet before us. It is led to these results by an understandable desire to follow what it believes to be the will of Congress. But in so doing, the court attributes to the legislature views that Congress is most unlikely to have even considered, let alone held.[1]

This case raises principally two questions. The first is whether Congress, by the language it used in the PLRA, sought directly to terminate preexisting court-ordered consent decrees,[2] or whether, instead, Congress used its paramount powers merely to alter the underlying law and left it up to the courts to exercise their traditional role of applying those changes. This question may seem formalistic, since the courts, responding to the congressional action, would in the case before us be inexorably led either to terminate the decrees or to bar future relief under them, thereby reaching precisely the same result whichever reading is given to the congressional language. In fact, however, it entails issues of the most fundamental sort concerning the Separation of Powers.

1. Concededly, all the other courts of appeals that have confronted the legislation before us today have reached similar—or, in the case of a panel of the Ninth Circuit, which held the statute unconstitutional, equally unfortunate—results. *See, e.g., Imprisoned Citizens Union v. Ridge*, 169 F.3d 178 (3d Cir.1999); *Taylor v. United States*, 143 F.3d 1178 (9th Cir.1998), *petition for rehearing granted, and panel opinion withdrawn*, 158 F.3d 1059 (9th Cir.1998) (en banc); *Hadix v. Johnson*, 133 F.3d 940 (6th Cir.1998), *cert. denied*, — U.S. ——, 118 S.Ct. 2368, 141 L.Ed.2d 737 (1998); *Dougan v. Singletary*, 129 F.3d 1424 (11th

Cir.1997) (per curiam), *cert. denied*, — U.S. ——, 118 S.Ct. 2375, 141 L.Ed.2d 743 (1998); *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649 (1st Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998); *Gavin v. Branstad*, 122 F.3d 1081 (8th Cir. 1997), *cert. denied*, — U.S. ——, 118 S.Ct. 2374, 141 L.Ed.2d 741 (1998); *Plyler v. Moore*, 100 F.3d 365, 372 (4th Cir.1996). On this point, see *A Cautionary Note, infra* Part III.

2. Except in certain limited circumstances. *See ante* at 189–91.

The second question asks to what extent Congress intended by the PLRA to limit the ability of prisoners to enter into contracts, enforceable in state courts, by which the prisoners obtain benefits in exchange for the waiver of possible federal claims. The answer to this latter question is entirely independent of the answer given to the first question. For, regardless of whether the PLRA directly terminated (or indeed vacated) federal court judgments or merely led courts not to give these consent decrees future effect, it would still remain uncertain whether the PLRA permitted state courts to find in existence and to enforce, under state contract law, agreements arrived at by the parties contemporaneously with the federal court consent decrees. I respectfully believe that the court today answers both of these questions incorrectly. Because the answers to these questions do not affect the outcome in the case before us, and because, as to some of the subsidiary issues in the case, I agree with the majority's reasoning as well as its conclusion, I concur in the court's result,[3] while strenuously, though respectfully, dissenting from most of its reasoning.

## I. DOES THE PLRA DIRECTLY TERMINATE THE CONSENT DECREES?

### A. The Language of the PLRA and Legislative Intent

The relevant provision of the PLRA, 18 U.S.C. § 3626(b)(2), reads:

Immediate Termination of Prospective Relief.—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right,

and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C.A. § 3626(b)(2) (West Supp.1998).

On its face, this language does not terminate the consent decrees or any other court judgments. It does no more than prohibit *prospective relief* under the prior judgments. And, as both the panel opinion and the *in banc* majority concluded, such termination of prospective relief in federal courts is clearly constitutional. The *in banc* majority also holds that this language bars *state* courts from granting prospective relief under the consent decrees and that it does so constitutionally.

On this latter point, the panel had held the opposite. Despite some legislative history to the contrary, the panel concluded that the PLRA terminated federal court jurisdiction but left state courts free to enforce the decrees.[4] The question is a close one, and I am not fully convinced by the majority, but it is sufficiently in doubt that I am not inclined to dissent on the issue. Moreover, I agree completely that, if the PLRA limits state as well as federal courts from granting prospective relief under the decrees, it does so constitutionally.

Were this all there was to this section of the PLRA, the *in banc* court and I would not diverge on the first of the two issues before us. Our disagreement stems from the way in which the majority of the court interprets the definitional section that applies to this part of the PLRA. That section reads as follows:

(1) the term "consent decree" means any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements;

. . . .

(5) the term "prison" means any Federal, State, or local facility that incarcerates or detains juveniles or adults ac-

---

**3.** *See infra* note 21.

**4.** *See Benjamin v. Jacobson,* 124 F.3d 162, 168, 174 (2d Cir.1997).

cused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law;

(6) the term "private settlement agreement" means an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled;

(7) the term "prospective relief" means all relief other than compensatory monetary damages;

. . . .

(9) the term "relief" means all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements.

18 U.S.C. § 3626(g).

The majority takes this definitional section to mean that the federal court judgments—the consent decrees themselves—are part of the relief that the PLRA directly terminates. It concedes that such a reading, albeit literal, is not natural. *See ante* at 181. And, after correctly suggesting that Congress has a right to define one thing to mean something different from

what it normally means, the court looks to the legislative history of the PLRA to conclude that Congress has, in effect, done just that. *See ante* at 184–85. In this respect, the court agrees with the First Circuit's decision in *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649 (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998), which, after finding the same reading of § 3626(g) to be unlikely, nevertheless, on the basis of legislative history, deemed it to be what Congress intended. *See id.* at 654.[5]

The problem with such a reading—apart from its admitted linguistic awkwardness—is that there is no reason to suppose that Congress intended it. The legislative history cited by the majority (and by the First Circuit) surely shows that Congress meant, and vehemently so, not to have such consent decrees enforced by federal courts except as strictly necessary to protect federal constitutional rights. *See* H.R. Conf. Rep. No. 104–378, at 166 (1995); H.R.Rep. No. 104–21, at 24–26 (1995). Less clearly, the same legislative history can be read—as the *in banc* majority does—to indicate that Congress, having

---

**5.** The panel opinion, in contrast, argued that reading the PLRA's definition of "prospective relief" found in § 3626(g)(7) (which the PLRA orders to be "immediate[ly] terminat[ed]") to include consent decrees "has significant linguistic problems." *Benjamin II,* 124 F.3d at 167. This was because decrees or settlement agreements are not forms of relief akin to injunctions or damages. Relief, instead, is generally understood to be made available *under or pursuant to* a consent decree or settlement agreement. Thus, although one could read the PLRA's definition of "prospective relief" (which includes "all relief other than compensatory monetary damages," 18 U.S.C. § 3626(g)(7), and "means all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements," *id.* § 3626(g)(9)), to encompass consent decrees, the panel instead read the termination of prospective relief ordered under § 3626(b)(2) as leaving the decrees intact, but removing federal jurisdiction to order any future relief under those decrees. *See Benjamin II,* 124 F.3d at 167.

The panel did so because adopting the first reading would require viewing private settlement agreements as a type of relief. And that, the panel said, made no sense because private settlement agreements are simply not a form of relief. Therefore, the panel argued, one should "read the definitional phrase as saying 'the term "relief" means all relief in any form that may be granted or approved by the court, and includes [all relief granted pursuant to] consent decrees but does not include [relief granted pursuant to] private settlement agreements.' " *Id.*(alteration in original). I continue to believe that this reading of the provision is the correct one.

To put it another way, while Congress can, for example, direct us to treat bananas as if they were apples, when Congress, in a definitional section, seems to say that bananas *are* apples, we should ask whether that is really what Congress meant or whether, instead, it merely intended to bring about the same result (identical treatment for both types of fruit) without requiring such an abuse of words.

barred prisoners from obtaining federal relief under the decrees, wished to prevent them from going into state court and getting the same decrees enforced there. *See, e.g.,* H.R.Rep. No. 104–21, at 25 (noting that the provision will "insure[ ] that inmates will not simply run from the federal courthouse to the state courthouse to bring the same suits and to demand the same burdensome and unnecessary relief that the federal courts have irresponsibly imposed on local judicial systems"). But there is nothing in what the majority (and the First Circuit) cites, or in what I have been able to find, that indicates that Congress meant to infringe on an existing *judgment of the courts,* rather than merely to change the underlying law, so that the courts would reach the same ultimate result by modifying the effect of their own prior rulings. In other words, there is nothing in the legislative history that in any way suggests that Congress cared a jot or tittle about whether *relief* under the decrees was to be precluded as a result of court adherence to the PLRA, or whether the prior court judgments—that is, *the decrees themselves*—were to be terminated directly by congressional fiat.[6]

The difference between the two, though seemingly of no interest to Congress—which wanted certain *results* and was understandably unconcerned with process—is fundamental to a sound doctrine of Separation of Powers and hence to the constitutionality of the PLRA. As the majority reads the PLRA, Congress would for the first time in our constitutional history have validly commanded the alteration or termination of a court judgment. Giving the statutory language its more natural meaning would instead read the law to do no more than what Congress (with the courts' approval) has frequently done in the past. *See, e.g., Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 431–32, 15 L.Ed. 435 (1855) (*"Wheeling Bridge II "*). And this still would achieve precisely the same results in terms of the prisoners before us and of their rights under these decrees. I believe the court reaches its radical conclusion because it fails to appreciate the appropriately formalistic nature of the Separation of Powers doctrine.

*B. Good Fences Make Good Neighbors* [7]

The Sovereign cannot, either as a result of contracts and consent decrees into which it has entered, or as a result of court judgments, be precluded from governing in the public interest to the full extent of its powers. Thus, a contract by which the government agrees not to go to war for a certain number of years in exchange for an agreement by a manufacturer to produce pruning hooks instead of spears cannot

---

6. And here, the fact that the *in banc* majority reads the PLRA to bar prospective relief in state as well as federal courts becomes crucial. As the panel read the PLRA, the decrees—if they survived—could be enforced in state courts. Hence, under the panel's reading, the termination *vel non* of the decrees themselves directly affected results. It is for that reason that the panel said that the difference between termination of the decrees and termination of future relief under them was not simply formal. *See Benjamin,* 124 F.3d at 168. As the *in banc* court reads the PLRA, instead, future relief is barred in *any* court. That being so, the *result* is identical whether the decrees are terminated or whether courts are precluded from giving future relief under them.

7. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 240, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (quoting Robert Frost, *Mending Wall, in The New Oxford Book of American Verse* 395–96 (Richard Ellmann ed., 1976)). Of course, Justice Breyer, who wrote separately in *Plaut,* was correct to point out that the poet was making a different point. *See Plaut,* 514 U.S. at 245, 115 S.Ct. 1447 (Breyer, *J.,* concurring in the judgment) (quoting Frost in turn: "Before I built a wall I'd ask to know/ What I was walling in or walling out."). But regardless of whether Justice Breyer is correct as a literary critic, Justice Scalia's point is well-taken—the Framers had a keen appreciation of the importance of drawing sharp distinctions (building high walls, as it were) between the domains of the respective branches of our federal government.

keep the Sovereign from initiating hostilities, and neither can a consent decree between the manufacturer and the Sovereign (entered into, let us say, in settlement of an antitrust action in the spear industry). Similarly, a consent decree (or a contract, for that matter) by which a state agrees to furnish cigarettes to prisoners if they are willing to drop an action against the state cannot keep the government (either state or national) from passing laws prohibiting the distribution of cigarettes. The fact that in all such cases no court would thereafter be able to enforce the preexisting contract or the prior court judgment (embodied in a consent decree) is of no significance and does not, under the Separation of Powers doctrine, limit the capacity of the state validly to enact such laws.[8]

In the same way, the existence of court judgments that have some future consequences—orders that damages be paid, or that a nuisance or a continuing trespass be enjoined, for example—in no way precludes the Sovereign from altering laws governing legal tender or nuisance or trespass so that the courts will be led to ignore or to alter their earlier rulings and thereby, in effect, to nullify their prior judgments. This is so with respect to judgments that have predominantly present effects. Thus, a court would necessarily and properly amend a decree ordering that damages be paid in gold so as not to violate a subsequent statute prohibiting the private transfer of gold. This is also so, and more likely to happen, when a judgment (like a consent decree or an injunction) has important future effects.

The difference between the two situations is simply that, in the latter case, the probability that the legislature will intervene—and render the prior judgment, contract, or consent decree effectively unenforceable by the courts—is much greater than in the former. In both cases, however-

er, the point is the same. The Sovereign being Sovereign cannot be kept from passing laws, and thereby furthering its view of the public interest, merely because a contract, consent decree, or judgment of any sort exists and would be negatively affected or rendered unenforceable as a result of such legislation. The legislature, in all such cases, acts on its side of the constitutional fence. And its good neighbor—the judiciary—responds accordingly on its own terrain.

That is the meaning of *System Federation No. 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), in which the Supreme Court required the " 'court of equity to modify an injunction in adaptation to changed conditions.' " *Id.* at 647, 81 S.Ct. 368 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932)). In *System Federation*, the existing consent decree forbade party railroads and unions from discriminating against nonunion laborers. *See id.* at 644, 81 S.Ct. 368. A subsequent congressional amendment to the Railway Labor Act permitted, in certain circumstances, contracts requiring union labor. *See id.* As a result, the Supreme Court found that the district court had abused its discretion when it refused to modify the consent decree. *See id.* at 650–53, 81 S.Ct. 368; *see also Swift & Co.*, 286 U.S. at 114, 52 S.Ct. 460 ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.").

It is also the meaning of *Wheeling Bridge II*. In *Pennsylvania v. Wheeling and Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 14 L.Ed. 249 (1851) ("*Wheeling Bridge I*"), the Court had found that a bridge over the Ohio River was a public nuisance because its height obstructed the free navigation of the river and thus con-

---

8. *See* Guido Calabresi, *Retroactivity: Paramount Powers and Contractual Changes*, 71 Yale L.J. 1191, 1202–03 (1962) (collecting cases, and noting that, even when a government is a party to a contract and alters that contract to its financial benefit, the government is not barred from doing so, as long as it demonstrates that the change was also passed in part for the general welfare).

travened regulations of Congress issued pursuant to the Commerce Power. *See id.*, 54 U.S. (13 How.) at 626. A subsequent enactment by Congress had declared the bridge to be a post-road—and therefore not subject to nuisance law—and found that, at its proposed height, the bridge did not interfere with any public rights of free navigation. *See Wheeling Bridge II*, 59 U.S. (18 How.) at 426. Accordingly, in *Wheeling Bridge II* (which came back to the Court when the prior victors sought a contempt order against the bridge company), the Court recognized the change in the underlying law (and "rights") and therefore determined that the injunctive decree could no longer be enforced by the courts. *See id.*, 59 U.S. (18 How.) at 431–32.[9]

The language that the Court used in *Wheeling Bridge II* is instructive:

[T]hat part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the meantime, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with law, no more than there would be where the plaintiff himself had consented to it, after the rendition of the decree.

*Wheeling Bridge II*, 59 U.S. (18 How.) at 431–32.

In these cases, and many others, *see, e.g., Agostini v. Felton*, 521 U.S. 203, ——, 117 S.Ct. 1997, 2018, 138 L.Ed.2d 391 (1997) (ordering the district court to vacate "a continuing injunction entered some years ago in light of a *bona fide*, significant change in subsequent law"); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 388, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law."), the legislative and executive branches acted, within their powers, to alter the law, and the courts inevitably and properly adjusted their prior decrees to make the judgments conform to the law as it had come to be. *In none of these cases, however, did the political branches themselves attempt to modify a court judgment. And in none of them did they order a court to do so.* The fact that these branches undoubtedly wished to bring about the result achieved, and that they enacted the law with the expectation that the courts would inexorably be led to alter their prior rulings, in no way undermined the validity of what the political branches did … on their side of the constitutional line.

9. Subsequent Supreme Court cases have repeatedly interpreted *Wheeling Bridge II* as being premised on this rule. *See, e.g., United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 70, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (citing *Wheeling Bridge II* for the proposition that "[i]t is for Congress to decide what is and what is not an obstruction to navigation"); *Gibson v. United States*, 166 U.S. 269, 272, 17 S.Ct. 578, 41 L.Ed. 996 (1897) (noting that in *Wheeling Bridge II*, "it was ruled that the power of congress to regulate commerce includes the regulation of intercourse and navigation, and consequently the power to determine what shall or shall not be deemed, in the judgment of law, an obstruction of navigation"); *see also United States v. Klein*, 80 U.S. (13 Wall.) 128, 146–47, 20 L.Ed. 519 (1871) ("[In *Wheeling Bridge II*] the court was left to apply its ordinary rules to the new circumstances created by the act. In the case before us *no new circumstances have been created by legislation.*" (emphasis added)); *cf. Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) (concluding that a revised environmental statute, which mentioned specifically two pending federal cases, did not violate the Separation of Powers because it "compelled changes in law, not findings or results under old law").

When, instead, the legislature has sought on its own to modify a court decree, when it has ordered the alteration or re-opening of a final judgment, the Supreme Court has expressly barred it from doing so. That is precisely what *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), told us is forbidden by the doctrine of Separation of Powers. As the Court stated in *Plaut*, "We know of no previous instance in which Congress has enacted retroactive legislation requiring an Article III court to set aside a final judgment, and for good reason. The Constitution's separation of legislative and judicial powers denies it the authority to do so." 514 U.S. at 240, 115 S.Ct. 1447; *see also Hayburn's Case*, 2 U.S. (2 Dall.) 408, 411, 1 L.Ed. 436 (1792) (opinion of Wilson and Blair, *JJ.*, and Peters, *D.J.*) (noting that Congress cannot interfere with the judicial determination that a claimant has a right in the future to receive a pension); *id.*, 2 U.S. (2 Dall.) at 413 (opinion of Iredell, *J.*, and Sitgreaves, *D.J.*) (same).[10]

The distinction is simple and directly germane to the case before us. If the PLRA constitutionally deprives the federal (and state) courts of jurisdiction to enforce consent decrees of the sort before us, then the courts affected will necessarily refuse to give future effect to these decrees. If

instead the PLRA seeks directly to order the same courts to alter, modify, or terminate the decrees themselves, then it attempts to do exactly what has never been permitted. For then it grants the legislative and the executive branches naked power over the courts and their holdings. Such a grant impermissibly crosses the fence and trespasses on the judicial terrain.

In upholding this unprecedented infringement, the *in banc* court (like the other circuits that have read the PLRA directly to terminate the consent decrees) relies on *dicta* in *Plaut*. The Court in *Plaut*, upholding the strictest form of Separation of Powers, differentiated *Wheeling Bridge II* from the case then before it. It stated that *Wheeling Bridge II* distinguished itself, since it involved legislation that only "altered the prospective relief of injunctions," rather than a current judgment. *Plaut*, 514 U.S. at 232, 115 S.Ct. 1447. I believe that the majority misreads this statement when it says that legislatures may directly terminate judgments so long as they have only future effects.

It is hard to see why it should make any difference—for the doctrine of Separation of Powers—whether the judgment of the judicial branch that is legislatively interfered with is one that has prospec-

---

10. The majority emphasizes that it is not deciding the application of *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), to this case, noting that plaintiffs chose not to pursue the *Klein* argument, which they made to the panel, before the *in banc* court. Accordingly, the question remains open. I believe that interpreting the PLRA provisions before us to mean what the majority reads them to mean renders the provisions violative of both *Plaut* and *Klein*. In *Klein*, the Supreme Court held that the Separation of Powers doctrine is violated when Congress prescribes a rule of decision for courts to follow without permitting courts to exercise their judicial powers independently. *See id.*, 80 U.S. (13 Wall.) at 146–47. The PLRA, on the majority's reading, not only reopens final judgments by directing federal courts to cancel existing decrees, it also appears to dictate the rule of decision for a

distinct group of Article III cases in violation of *Klein*.

What is deeply troubling, however, is that, although the majority today *purports* to leave the *Klein* question open, by interpreting the PLRA in the manner that it has, it precludes a future panel of this Court (faced with another challenge to the PLRA in which a *Klein* argument is pursued) from interpreting the PLRA in a manner that would avoid the grave constitutional difficulties under *Klein* that inhere in the majority's interpretation. Such a future panel will therefore be forced to address the *Klein* issues head on—and might perhaps be led to strike down the PLRA provisions that would clearly survive on the *Benjamin* panel's reading of the law. The statute would then fall—irony of ironies—as a result of the majority's desire to apply a non-existent congressional intent in the case before us.

tive effect or one that does not. In both instances, the other branches directly invade judicial territory. Nor is such a distinction needed, or even useful, in explaining *Wheeling Bridge II*. The difference, as previously noted, between present and future effects can be crucial when the legislative and executive branches have not sought to alter a judgment but have instead promulgated a law that alters the legal rules on which the judgment was based. In such cases—for example, *Wheeling Bridge II*—it is clearly to be expected that a court will modify a judgment's prospective effect. And, since there are no impediments to its doing so, that judicial modification is inevitable. *See, e.g., System Federation,* 364 U.S. at 647, 81 S.Ct. 368 (requiring such a change); *Swift & Co.,* 286 U.S. at 114, 52 S.Ct. 460 (same). Conversely, it is rare that the courts have the authority to alter a judgment that has no future consequences. *See, e.g., Agostini,* at ——, 117 S.Ct. at 2018 ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)...."). But when they do, the rule of *Wheeling Bridge II* would apply to these judgments as well. *See Pioneer Investment Services Co. v. Bruns-*

*wick Associates Ltd. Partnership,* 507 U.S. 380, 393–94, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (citing with approval *Klapprott v. United States,* 335 U.S. 601, 613–14, 69 S.Ct. 384, 93 L.Ed. 1099 (1949) (opinion of Black, *J.*) (permitting a judgment that had become final four years earlier to be reopened under Rule 60(b) in the interest of justice)); *Matarese v. LeFevre,* 801 F.2d 98, 106 (2d Cir.1986) ("A postjudgment change in the law having retroactive application may, *in special circumstances,* constitute an extraordinary circumstance warranting vacation of a judgment." (emphasis added)).

All of these are totally different from the situation that occurred in *Plaut* (and not in *Wheeling Bridge II* ). In *Plaut,* the legislative and executive branches purported to modify a judgment on their own. As such, they manifestly interfered with the judicial branch, and endangered the Separation of Powers. That, moreover, would have been so even if the judgment they abused implicated future instead of present effects. For then too, Congress and the President, by directly altering an order of the court, would have impermissibly invaded the judicial terrain. And that is precisely what *Plaut* says they may not do.[11]

---

11. Professors Tushnet and Yackle argue similarly:

> *Plaut*'s analysis suggests that *Wheeling Bridge* cannot stand for the broad proposition that Congress may alter any injunction whatsoever. That broad proposition would mean that the fundamental separation-of-powers principle articulated in *Plaut* does not apply to injunctive actions at all. But nothing in the Court's statement of the principle suggests why congressional interference with actions at law is more problematic than congressional interference with equitable remedies.

> The Court in *Plaut* indicated the way out ... Federal Rule of Civil Procedure 60(b), which authorizes the federal courts to relieve parties from a final judgment for specified reasons ... [and] reflects and confirms the courts' own inherent and discretionary power.

> The Court's emphasis on judicial discretion, which might be understood in this

context as an essential attribute of the judicial power protected by *Plaut*'s separation-of-powers holding, explains the limits of *Wheeling Bridge*'s holding. In *Wheeling Bridge* the interstate commerce clause gave Congress the power to declare that the bridge did not interfere with interstate commerce.

Mark Tushnet & Larry Yackle, *Symbolic Statutes and Real Laws: The Pathologies of the Antiterrorism and Effective Death Penalty Act and the Prison Litigation Reform Act,* 47 Duke L.J. 1, 61–62 (1997) (footnotes and internal quotation marks omitted).

As Alexander Hamilton wrote in the Federalist Papers, "[the] legislature without exceeding its province cannot reverse a determination once made, in a particular case; *though it may prescribe a new rule for future cases.*" The Federalist No. 81, at 484 (Alexander Hamilton) (Clinton Rossiter, ed., 1961) (emphasis added).

The majority today seeks to blur the distinction by holding explicitly what most of the other circuits have held at least implicitly: that Congress may only directly affect an existing injunctive decree if the legislature both has the power to alter the underlying substantive law and has actually exercised that power in the statute at issue. *See ante* at 188. This express limitation is highly desirable in that it precludes Congress from seeking to modify prior judgments both in areas as to which it has no underlying constitutional authority (for example, diversity cases), and also in areas where it has the authority, but has not consciously chosen to exercise it. The majority's limitation, however, in no way cures the fundamental Separation of Powers defect. It remains the fact that, under the majority's ruling, the legislature is, for the first time in our history, permitted directly to order courts to modify their final judgments. And the court fails to explain why such a direct infringement is more acceptable when dealing with judgments that have long-term future effects (like injunctions) than it is as to judgments the effects of which are more proximate (like restitution or damages).

The majority's approach, moreover, highlights the manifest absurdity of ascribing to Congress the intent to affect directly the decrees in *this* case. The majority's holding means that in order to command direct termination of the decrees, Congress must have changed the underlying law so as to render the decrees unenforceable. But once it has done so—and we all agree that it has—the Supreme Court's jurisprudence, as set forth in cases like *System Federation*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), and *Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), makes clear that lower courts are themselves obligated to comply with the altered underlying law and to cease to enforce the decrees. Why on earth then would Congress intend to do more and seek to void the decrees directly when the same result would occur anyway? And why should we read the legislature's admittedly awkward language to do this when such a reading has radical consequences for the traditional division between courts and legislatures? Indeed, the fact that the majority relies upon *System Federation* and *Swift & Co.* to make its point, *see ante* at 188–89, drives home the fact that holding that Congress terminated the decrees themselves (rather than that it altered the underlying law) does not affect the practical result in this case. It merely allows Congress gratuitously to undermine the doctrine of the Separation of Powers and invade what is traditionally the province of the judiciary.

### C. The Formal Structure of Separation of Powers Doctrine

The distinction between altering the law underlying a judgment—thus leading the courts to modify a judgment—and altering the judgment itself may seem a formalistic one. But that is not a valid criticism.[12] As Justice Scalia, the author of the majority opinion in *Plaut*, wrote in another context, "Of all the criticisms leveled against textualism, the most mindless is that it is 'formalistic.' The answer to that is, *of course it's formalistic!* The rule of law is

12. Though the majority's approach and mine have the same effect on prisoners' rights in the case before us, the difference between us may not be totally formal. The majority's position may permit the legislature to order the precise response that the courts must make as a result of an alteration in the underlying law. Thus, the majority seems to countenance a legislative order that a decree be vacated, when in fact termination of the judgment would equally well comport with the changed law. In the instant case, the issue is of no practical significance, but it might well be in other situations. It is possible that the majority's holding means to be more limited still and that its decision allows Congress to order a specific change in a judgment *only* when that change is the sole way of adapting the judgment to the altered underlying law. If that is so, the absurdity of ascribing such an intent to Congress becomes even clearer, for then under *System Federation*, the courts are bound to make the identical change on their own.

*about* form.... Long live formalism. It is what makes a government a government of laws and not of men." Antonin Scalia, *Common–Law Courts in a Civil Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, in *A Matter of Interpretation: Federal Courts and the Law*, at 3, 25 (Amy Gutmann ed., 1997) (emphasis in original). His statement applies equally here.[13]

The Separation of Powers doctrine, *Plaut* tells us, is a "*structural safeguard* rather than a remedy to be applied only when a specific harm, or risk of specific harm, can be identified." *Plaut*, 514 U.S. at 239, 115 S.Ct. 1447. And the doctrine is a "prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Id.*

It is no accident, therefore, that what some may label as "formalisms" are a mainstay of the Court's Separation of Powers and Federalism decisions. The Court's recent decision in *Printz v. United States*, 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), reiterated this point:

> Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "for-

malistic" in a given case to partisans of the measure at issue.... But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist ... temptation....

*Id.* at ——, 117 S.Ct. at 2383 (quoting *New York v. United States*, 505 U.S. 144, 187, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)) (internal quotation marks omitted).

In other words, when great structural boundaries are at stake, the Court has repeatedly made clear that *how* something is done (*i.e.*, whether a judgment is directly altered or whether the underlying law is changed in such a way as to lead the courts to modify their judgments) can be at least as important as the *result* that is achieved.[14]

In the context of the Separation of Powers, it is the formal independence of the courts that is safeguarded by an absolute rule—never before infringed—that says that court judgments are not to be touched by the legislative and executive branches. The basic power to legislate (and to enforce that legislation) in the public interest is not undercut by this formal rule (that is, the power to achieve a *result* in terms of prisoners' rights is unaltered), but the dignity of the courts *qua courts* is protected by it.[15]

**13.** This, of course, is not to suggest that the Separation of Powers doctrine is only about formalisms. Separation of Powers notions may well make some results unconstitutional no matter how they are obtained. Thus, Congress presumably could not require Article III judges regularly to take on prosecutorial functions, regardless of whether it did so directly or indirectly.

**14.** Nowhere is this exemplified more dramatically than in the Court's Eleventh Amendment jurisprudence. *See, e.g., Osborne v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 857, 6 L.Ed. 204 (1824) (positing the critical distinction between suing a state *eo nomine* or its officers for Eleventh Amendment purposes: "it is the party named in the record"). A person suing a state in federal court, therefore, must sue its officers as opposed to the state itself—even though the result is the

same. Similarly, one who wishes to sue a state officer for money damages in federal court must label the suit as against the officer in his or her individual capacity; otherwise the claim is barred by the Eleventh Amendment. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that the Eleventh Amendment bars claims for retroactive damages that run against the state treasury). Thus, the Eleventh Amendment protects the formal Sovereignty of the state by rules that in most cases do not alter results.

**15.** The same approach has been consistently applied by the Supreme Court in other areas to preserve the delicate balance among the branches of government as well as between our federal and state governments. *See, e.g., City of Boerne v. Flores*, 521 U.S. 507, ——,

## D. What the PLRA Intended To Do

Thus, if we were to conclude that Congress intended by the PLRA directly to terminate the consent decrees, and thereby on its own to modify judgments, we would have to face the question of whether such a radical step was constitutionally permitted despite its patent infringement of the line that divides the courts from the other branches. But, as we have seen (as the *in banc* majority itself admits, and as the panel argued at length), the language of the statute requires no such interpretation. *See ante* at 183–85; *Benjamin,* 124 F.3d at 167. Is that reading nonetheless mandated by the legislative history of the PLRA? I think not.

Let me be clear that I am not, in this respect, simply relying, as did the panel, on the mass of cases that suggest (properly) that statutory language should be read to avoid serious constitutional difficulties,[16] though those cases would certainly be enough to justify my reading. In the case before us, the argument against the existence of a congressional intent to terminate the consent decrees finds a far simpler grounding. If—as I believe can be demonstrated—everything that Congress sought to achieve by this part of the PLRA is as well accomplished by terminating the future effects of the decrees as by destroying the judgments themselves, it is ill-advised to suppose that Congress, by its ambiguous language, meant to do something that raises such severe Separation of Powers problems.

Before one assumes that, regardless of results, Congress intended to be so radical, one must, I suggest, have some direct indication that the legislature wanted specifically to infringe on the dignity of the courts, and to do so despite the formal requirements of the Separation of Powers doctrine. One must, in other words, have a clear sign that it did not merely wish to

117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997) (striking down the Religious Freedom and Restoration Act, noting that "[Congress] has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation"); *Printz,* 521 U.S. at ——, 117 S.Ct. at 2378 (striking down portions of the Brady Act, which imposed certain regulatory obligations on state law enforcement officials, based in part on the fact that the law would effect a diminishment of the executive branch's power to administer the laws); *New York,* 505 U.S. at 187–88, 112 S.Ct. 2408 (holding a federal hazardous waste law imposing obligations on states unconstitutional for compelling states "to enact or administer a federal regulatory program"); *Gregory v. Ashcroft,* 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (requiring a clear statement by Congress demonstrating its intent that the Age Discrimination in Employment Act apply to state judges); *Bowsher v. Synar,* 478 U.S. 714, 726, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) ("Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment."); *INS v. Chadha,* 462 U.S. 919, 958–59, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (striking down a single-house legislative veto of executive decisions respecting the suspension of alien deportation orders); *id.* at 964, 103 S.Ct. 2764 (Powell, *J.,* concurring in the judgment) (finding that the exercise of the legislative veto with respect to six individuals was "clearly adjudicatory"). In *Printz,* the Court posited that the "separation of the two spheres is one of the Constitution's structural protections of liberty." 521 U.S. at ——, 117 S.Ct. at 2378. And it declared that the separation and independence of the branches provide a commensurate and equally important structural protection. *See id.* (citing *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961); The Federalist No. 28, at 180–81 (Alexander Hamilton)).

16. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *cf. Almendarez–Torres v. United States,* 523 U.S. 224, ——, 118 S.Ct. 1219, 1228, 140 L.Ed.2d 350 (1998) ("[T]hose who invoke the doctrine must believe that the alternative is a serious likelihood that the statute will be held unconstitutional. Only then will the doctrine serve its basic democratic function of maintaining a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made. For similar reasons, the statute must be genuinely susceptible to two constructions after, and not before, its complexities are unraveled....").

achieve certain ends with respect to prisoner litigation. Yet, neither the *in banc* court, the First Circuit, nor any other court that has dealt with these provisions of the PLRA has cited anything that Congress might have tried to accomplish by this part of the PLRA that is not obtained precisely to the same degree regardless of whether the decrees are themselves terminated or, instead, the federal and state courts are denied jurisdiction to give the decrees future effect.

The *in banc* majority argues at length that Congress meant to get the federal courts out of the business of running jails, and it cites any number of congressional statements to that effect. I agree. But whether the consent decrees before us are terminated (or, for that matter, vacated) makes no difference whatsoever in this regard, so long as it is the case that federal courts are denied jurisdiction to give future effect to the decrees. And that is precisely what will occur under my alternate reading of the statute.[17]

The majority states that Congress sought to preclude *state* courts—as well as federal ones—from giving future effect to the decrees. It therefore interprets the PLRA as preventing a prisoner (barred from getting enforcement of the consent agreement in federal court) from going to state court and getting the decree enforced there. *See ante* at 182–83. But, once again, the posited congressional aim is as readily accomplished by giving the statutory language its natural meaning so that the PLRA (by limiting the jurisdiction of state as well as federal courts) terminates future relief under the decrees as it is by ending the decrees themselves.

There remains the question of whether Congress intended to prohibit state *contract* suits designed to vindicate prisoner

claims that might also be recognized in the decrees. And that question, which is the second issue as to which I disagree with the majority, is a complicated one about which I will have more to say anon. For purposes of the issue that I am currently addressing, however, the question can be dealt with quickly. The survival of state law contractual rights *vel non* is unaffected by whether the decrees themselves are terminated or whether, instead, future relief *under the decrees* is forbidden in both state and federal courts. The issue of whether private state contractual rights perdue remains the same on the reading that would end the decrees themselves and on the reading that would not directly touch the judgments but would bar federal and state courts from granting future relief under them.[18]

It follows that it makes no sense to assume that Congress intended under the PLRA to do something never before done. Since everything it wished to achieve is as fully accomplished by less radical methods, courts should not just hesitate, *they should be bound to refrain*, from giving the congressional language an awkward (though not impossible) reading, which, having no purpose, constitutes a gratuitous contravention of the boundaries established by the Separation of Powers doctrine.

### E. Are the Limitations Imposed by the PLRA on State and Federal Court Jurisdiction Constitutional?

Before I turn to the second issue in this case—the survival of state law contractual rights under the PLRA—I must briefly address the question of whether Congress can constitutionally do what I read the PLRA as doing, namely limit severely the jurisdiction of both federal and state courts so as to bar most prospective relief under the consent decrees involved in the

---

17. This, of course, is only true in either instance where the need-narrowness-intrusiveness standard is not met. *See* 18 U.S.C. § 3626(b)(3).

18. It is not, moreover, harder to say that such rights are abrogated if the decrees themselves are left untouched and only their future effects are affected than it is to say that they do not survive if the decrees are deemed terminated. *See infra* Part II.B.

case before us. If Congress can so restrict the courts' jurisdiction, then—as I have just argued—the same results are achieved under my reading of the statute as under that of the *in banc* majority. If not—if the only way Congress can control the actions of state or federal courts is by terminating the decrees themselves—then my argument that Congress could not have intended the radical step of directly altering a court judgment would be seriously undercut. Fortunately, there can be no doubt that the restrictions on both federal and state court jurisdictions that I believe the PLRA mandates are constitutionally valid.

Whatever may be the outer boundaries of Congress's power to restrict the jurisdiction of the lower federal courts,[19] there is no question that the power of such courts can be limited to cases involving federal rights. *See Lockerty v. Phillips,* 319 U.S. 182, 187, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943); *Lauf v. E.G. Shinner & Co.,* 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872 (1938). The PLRA affects only cases in which there is no finding that the "relief is ... necessary to correct the current and ongoing violation of the Federal right" by "the least intrusive means" possible. 18 U.S.C. § 3626(b)(3). Hence the validity of such a restriction of jurisdiction cannot be

seriously questioned. *See ante* at 189–91; *Benjamin,* 124 F.3d at 169–70.

The issue is only slightly more complicated with respect to state courts. What, one might ask, is the constitutional basis for a federal limitation on the jurisdiction of state courts? The answer is that the PLRA prohibits state courts from giving effect to relief only when that relief is embodied in consent decrees that were entered into in settlement of suits claiming federal rights. Because the suits that culminated in the federal court decrees involved such "national" rights, Congress both directly and under the Necessary and Proper Clause can bar state courts from giving future relief under them. The original claims that gave rise to the decrees were federal ones, and Congress, which has authority over such claims, surely can restrict *any* court from giving future relief in exchange for their relinquishment. The question is, therefore, not one of federal *power*—the power is there. It is one of whether Congress intended to use that power. And the majority holds that Congress did indeed intend such a limitation.[20]

I conclude, therefore, that everything that Congress, by its language and by its intent as expressed in the legislative history of the PLRA, wished to accomplish can be constitutionally effectuated without reading the statute to order a direct infringement of court judgments.[21] Since

19. *See, e.g., Lockerty v. Phillips,* 319 U.S. 182, 187, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943) ("[N]othing in the Constitution ... requires Congress to confer equity jurisdiction on any particular inferior federal court."); *Lauf v. E.G. Shinner & Co.,* 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872 (1938) (upholding the provision of the Norris–LaGuardia Act limiting the ability of the federal courts to grant injunctive relief, and noting that "[t]here can be no question of the power of Congress ... to define and limit the jurisdiction of the inferior courts of the United States"). *But see* Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv. L.Rev. 1362, 1397 (1953) (positing constitutional limits on Congress' control of federal court jurisdiction).

20. While the panel disagreed, I do not think that the majority is clearly wrong is its hold-

ing. The words of the statute barring future relief under the decrees are not expressly limited to federal courts. And there is some legislative history indicating that Congress foresaw the possibility of attempts to obtain future relief under the decrees in state courts and wished to forbid it. *See supra* Part I.A. Together these are enough to make plausible the conclusion that future relief based on the decrees was meant to be made unavailable in either set of courts.

21. Since the majority interprets the PLRA as directly requiring the termination of the decrees at issue while I read the statute as doing no more than changing the underlying law so as to bar prospective relief under the decrees, it may seem strange that I concur in the court's holding "terminat[ing][the] forward-looking provisions of [the] consent decrees." *Supra* at 168. But, in fact, even under my

the statute in no sense *requires* such a reading, and since such a reading can properly be viewed as "awkward" and "not natural," it seems to me extraordinarily misguided so to interpret the Act. In doing this, the *in banc* majority (and the other circuits that have done the same) permits the constitutional walls between the judiciary and the other branches of government to be breached—and does so for no reason. A panel of the Ninth Circuit gave the same reading in order to strike the statute down.[22] It is hard to know which approach is more damaging to the genuine will of the Congress and to our constitutional structure.

## II. DO PRIVATE STATE CONTRACT CAUSES OF ACTION SURVIVE THE PLRA?

The second issue that divides me from the *in banc* majority is whether a state court can (after passage of the PLRA) determine that the prisoners before us, at the same time that they entered into consent decrees, also reached a meeting of minds with the entities that they had sued and that this meeting of the minds constituted a contract that, in the normal course of things, could be enforced in state courts. The question is properly divided into three parts: (1) Can parties to a consent decree be said under state law to have, independently of that decree, entered into a valid contract—at least in some circumstances? (2) If such a contract would—in some instances—be valid under state law, does the PLRA prohibit its enforcement in state courts? (3) What, if any, restrictions would a finding that valid state contracts existed place on future actions by state legislators with respect to such contracts?

I contend that the *in banc* majority's answer to the first question is probably wrong and, more important, improperly attempts to decide a question that is purely one of state law, thereby offending the most fundamental principles of Federalism. The answer to the second question is more complicated. Congress surely has the constitutional authority to prohibit the enforcement of otherwise valid state contracts when such contracts are entered into in circumstances like those before us. But, on the language and history of the PLRA, it is unlikely that Congress intended to prohibit such state law contracts.

reading of the PLRA, the court's result remains appropriate.

In *System Federation*, the Supreme Court instructed the lower courts to respond to legislative changes in underlying laws by opening and amending judgments that were still in their control. It follows that after the PLRA has, on my interpretation, prohibited future enforcement of the consent decrees before us, the courts are bound to react to that change. They may in principle do so in one of at least three ways. First, they may decide to do nothing and, leaving the decrees in place, decline to enforce their forward-looking provisions. Second, they may do what the district court and various other circuits have done and conclude that the best judicial reaction to the prohibition on future enforcement is to vacate the decrees themselves. (The fact that the statute does not mention vacatur no more precludes that reaction than did the fact that the statute at play in *Wheeling Bridge II* never mentioned the previous injunction keep the *Wheeling Bridge* Court from dissolving that injunction.) Third, they may decide that the most appropriate response to the new law

is for the courts themselves to order the forward-looking provisions of the decrees terminated.

The effect on prisoners' rights of all three of these reactions is essentially the same, but the third solution strikes me as the most appropriate response. The statute expressly authorizes the parties to go to court and seek termination of such forward-looking provisions. See 18 U.S.C. § 3626(b)(2). And there seems to me to be no reason why the courts should not grant precisely this relief. Accordingly, my reading of the PLRA justifies a *court* order "terminat[ing][the] forward-looking provisions of [the] consent decrees." The majority believes that the statute itself commanded termination. The effect being the same, I concur in the court's result.

22. *See Taylor v. United States*, 143 F.3d 1178, 1184 (9th Cir.1998). The Ninth Circuit has withdrawn the panel opinion in *Taylor*, and has reheard the case *en banc*. *See Taylor v. United States*, 158 F.3d 1059 (9th Cir.1998) (en banc) (withdrawing panel opinion and granting rehearing en banc).

More fundamentally, since the issue is not before us in the current case, we cannot and should not decide it.[23] The answer to the third question is that very few restrictions would impede state legislatures from modifying such contracts.

### A. Can Parties to a Consent Decree Enter into a Separate and Potentially Valid State Law Private Contract?

The question of whether the parties, at the same time that they concluded the consent decrees, also achieved a meeting of minds such that a state might deem a state law contract to have been established, is—by definition—a state law issue. It is a totally different question from whether a federal *consent decree* can itself be enforced in state courts. By conflating the two issues, the court permits itself to cast doubt on whether such a requisite meeting of the minds can exist. But that is not for a federal court to say. What New York deems a valid contract is for New York to decide. And for federal courts to instruct New York on what does or does not constitute a proper meeting of the minds under New York law is as grievous a crossing of the boundaries imposed by Federalism[24] as the direct legislative alteration of a court judgment is of the boundaries imposed by the Separation of Powers.

Moreover, it would not be surprising if New York determined that at least some of the many consent decrees whose future effects the PLRA seeks to terminate did in fact give rise to state law contractual rights. In this respect, it is important to realize that the consent decrees that may be affected by the PLRA are many and highly varied in New York alone. A few—like the ones in the case before us—have generated a huge cavalcade of judicial administration and contain terms that were the result of continuous evolution and articulation over many years.[25] Many others simply settled a claim by giving the prisoner claimants a particular future benefit, and have lain judicially dormant ever since. To make a one-size-fits-all abstract judgment with respect to such differing agreements, as the majority appears to do, seems wrong to me. And it would be wrong even if the majority had the author-

---

**23.** The majority's opinion, in this respect, is entirely advisory and is not needed for its holding. Nor can its foray be justified under the guise of correcting analogous dicta in the panel opinion. In the first place, the panel's discussion of the possible survival of state law claims was not dicta. It was made necessary by the panel's conclusion that, without the possibility that such state claims might survive, the PLRA might well be unconstitutional on various grounds. *See, e.g., Benjamin,* 124 F.3d at 176. The majority rejects these constitutional claims without hesitation. That, it has a perfect right to do. But once it has done so, any further discussion of possible state law actions becomes totally unnecessary. *See Almendarez–Torres v. United States,* 523 U.S. 224, ——, 118 S.Ct. 1219, 1228, 140 L.Ed.2d 350 (1998). The most that might be justified, to avoid any lingering confusion arising from the panel's analysis, would be a statement to the effect that "since the *in banc* court finds the *statute to be constitutional* regardless of the existence of possible state law claims, it expresses no opinion on the matter and should not be read as agreeing

with the panel's analysis of such claims." *See infra* notes 26, 28.

**24.** *Cf. Gregory v. Ashcroft,* 501 U.S. 452, 464, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (requiring a clear statement from Congress before a federal statute will be read to apply to state officials).

**25.** The panel opinion noted, for example, that the decrees in the instant case

> have generated a judicially administered structure comprising over ninety related court orders and extending to more than thirty discrete areas of prison administration. The areas include the handling of detainees' mail and property, cell and body searches, maintenance of the physical plant, food service, and health and sanitary issues.... In 1982, pursuant to the agreement of the parties, a court monitoring agency called the Office of Compliance Consultants ("OCC") was created. The OCC has monitored compliance with the Consent Decrees since that time.

*Benjamin,* 124 F.3d at 165.

ity to do it.[26]

In the end, though, the essential point remains the same. For federal courts to tell states what they may, or should, or might consider to be contractually enforceable rights is simply not proper. The *in banc* court's opinion seems to do this, and I can only conclude that in its understandable eagerness to make clear that *the consent decrees themselves* are not enforceable in state courts, it went beyond what it can appropriately decide without perhaps intending to do so.[27] Moreover, since we cannot rule on what is outside our authority to determine, I believe that the statements by the *in banc* court with respect to the existence of such state law contracts, necessarily, have no legal effect.

### B. Does the PLRA Constitutionally Ban the State Courts' Enforcement of Contracts That Would Otherwise Be Valid Under State Law?

Holding that state law must decide whether a contract (enforceable in state courts) could have been created by the same circumstances that gave rise to the consent decrees, however, does not resolve the issue before us. We must also ask— even if the conduct of the parties gave rise to a state law contract—whether that

agreement was made unenforceable by the PLRA. And this question itself divides into three parts: (1) whether federal law can constitutionally bar enforcement of otherwise valid state law contracts like the ones before us, (2) whether it did so through the PLRA, and (3) whether this question is properly before us.

The answer to the first question is an easy yes. For the same reasons that federal law can bar state courts from giving future effect to these consent decrees, it can also bar enforcement in state courts of contracts that have arisen, if at all, in circumstances like those involved in the instant case. The contracts that state law might deem to have been made are all agreements for which the alleged consideration was the giving up of federal claims (and usually federal constitutional claims). There can be no doubt that Congress—if, for instance, it wished to discourage parties from too readily abandoning federal constitutional claims—could validly make unenforceable all contracts that waived or otherwise gave up such claims. One may question if that is what the Congress that passed the PLRA had in mind—but that is another issue. What one cannot deny is that the federal government can control

---

**26.** The Third Circuit has recently reached the same conclusion in *Imprisoned Citizens Union v. Ridge*, 169 F.3d 178 (3d Cir.1999):

If the Inmates have valid contractual claims that survive termination, such claims are "based solely upon ... [Pennsylvania] law".... The Inmates are therefore free to pursue relief in the Pennsylvania courts. It is not our province to speak to the validity of any "claims arising under [Pennsylvania] law," or to award relief therefor.

*Id.* at 190.

**27.** The panel opinion, in noting that some of these decrees might constitute state law contracts that could be enforced in state courts, observed that a federal question would arise if state courts discriminated against those contracts embodied in federal consent decrees, or those that were entered into in exchange for the giving up of federal claims. *See Benjamin*, 124 F.3d at 178–79 & n. 23. That is surely correct, *cf. Howlett v. Rose*, 496 U.S. 356, 367–72, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (holding that state courts' refusal to

entertain a § 1983 claim against a school district when state courts entertained similar state-law actions against state defendants violated the Supremacy Clause), but can be misunderstood. The point that the panel sought to make was *not* that state courts were bound to find valid state contracts embodied in the consent decrees. Far from it. All the panel said was that a state that held certain agreements *to be valid state contracts* could not discriminate against identical meetings of the minds and refuse to enforce them, simply because they were entered into in exchange for federal claims. State law can and must determine what it deems to be valid contracts and can do so fully and without the kind of interference that I suggest is implicit in the *in banc* court's opinion. What state law cannot do, without raising significant federal questions, is to refuse to enforce one of two or more otherwise valid contracts simply because that contract involves federal rights.

the abandonment of federal claims and can do so, if it wishes, by barring even *state* court enforcement of contracts that were negotiated in exchange for those claims.

The issue then becomes whether Congress did so under the PLRA. On the whole, I do not believe that it did. But, ultimately, this is not a question that is properly before us in this case, and we should therefore not attempt to answer it definitively now.

Whether Congress did so or not depends on the reading that is given to two seemingly contradictory clauses of the PLRA. The PLRA states:

(c) Settlements.—

(1) Consent decrees.—In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).

(2) Private settlement agreements.—

(A) Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a), if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled.

(B) Nothing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court any remedy available under State law.

18 U.S.C. § 3626(c).

Paragraph (c)(2)(A) appears to permit a private settlement agreement only "if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled." As such it would seem to bar state law contract remedies, since these typically go well beyond permitting the reinstatement of the suit settled by the contract.

Paragraph (c)(2)(B), however, immediately limits (c)(2)(A) and states "[n]othing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court *any* remedy available under state law" (emphasis added). And this paragraph clearly seems to indicate that all state law remedies remain available, including those that go beyond a reinstatement of the suit that the contract sought to settle. The very next paragraph of the statute, moreover, states: "[t]he limitations on remedies in this section shall not apply to relief entered by a State court based solely upon claims arising under State law." *Id.* § 3626(d).

How is one to reconcile these provisions? It seems likely that paragraph (c)(2)(A), when it limits court enforcement to "the reinstatement of the civil proceeding that the agreement settled," *id.* § 3626(c)(2)(A), is referring to *federal* court enforcement. In the prior paragraph the "court" whose power to grant a consent decree is being restricted manifestly refers to the federal court. And when succeeding paragraphs speak of the right to receive any remedy available under State law, the "court" in which these remedies can be obtained is instead expressly described as a "State court." *See, e.g., id.* § 3626(c)(2)(B).

For these reasons, I believe the better reading of these provisions is likely to be that the PLRA, whatever it meant to do to the consent decrees themselves or to future relief under them, did not also intend to prohibit or limit state contracts made in settlement of federal claims. It follows, therefore, that *if* a state court were to deem the meeting of minds that led to the consent decrees to be sufficient to give rise to valid state law contracts, the PLRA does not appear to bar local law enforcement of such local law claims. It does not seem to bar it, not because Congress could not do so constitutionally, but because Congress appears not to have precluded the suits.

In the end, though, this is a question that we should not decide at this time. We do not know whether any, some, most, or none of the consent decrees (whose future effects the PLRA sought to limit) arose in situations out of which state courts will find valid state law contracts also to have been made. Unless and until a state court finds that a valid state law contract exists, it is premature for us to rule on whether the PLRA would bar the local courts from enforcing such a contract. Since, moreover, the parties seeking relief before us have not asked for any preclusion of state court contract claims—they only seek termination and vacatur of the decrees—it would be improper for us to rule on the issue even if it were not premature. Once again, the question is not before us.[28]

\* \* \*

There remains one important point to be made with respect to state law contract claims. It is that the existence and survival of such state law claims under the PLRA is completely independent of whether the consent decrees are vacated, terminated, or left in place (with both federal and state courts barred from giving relief under them). If (as several circuits have held) the PLRA *vacates* the decrees, this in no way means that state courts cannot find that a valid contract (independent of the decrees) had been formed and was enforceable under state law. Indeed, such a state law finding would seem to fit precisely under the saving clause of § 3626(d) since by definition once the decree was vacated the claim could *only* be "based solely upon ... State law," given that no federal claims would be left. And the same would be true if the decrees were terminated, as ordered by the *in banc* (and First Circuit) holding. Once again any "relief entered by a state court" would have to be "based solely upon [contract] claims arising under State law." For here too, once the decrees were terminated, the claims would have no other basis.

It might be tempting to say that under the interpretation of the PLRA that bars future relief under the decrees but does not terminate them, the validity of state contract claims is, if anything, more doubtful. After all, if the decrees remain extant, it might seem at least plausible that the "relief entered by a State court" was *not* "based solely upon claims arising under State law" (and hence be permitted) but could, in part, derive from the still unterminated decrees (and hence be barred). But, in fact, that is not possible. On this reading, the PLRA bars all *relief* under the decrees (in state as well as federal courts). It follows that, also on this interpretation, any "relief entered by a State court" must be "based solely upon claims arising under State law."

Thus, nothing in the discussion of the possible existence of state law contracts alters what I said earlier when considering the Separation of Powers issue. Since the existence and survival of state law claims is independent of whether the decrees are obliterated or are left in place (and only prospective relief is barred), precisely the same result obtains whichever reading is given to the PLRA.

---

**28.** The Third Circuit, in dicta, twice asserted that the PLRA does not bar such potential state contract actions. *See Imprisoned Citizens Union*, 169 F.3d at 190 ("If the Inmates have valid contractual claims that survive termination, such claims are "based solely upon ... [Pennsylvania] law," and are not affected by the PLRA.... The Inmates are therefore free to pursue relief in the Pennsylvania courts."); *see also id.* at 187 n. 6 ("We express no opinion as to whether the Inmates have private rights in the consent decree. *See infra*, Section II.C.2. We simply note that if they do, those rights exist under state law and are not affected by the PLRA. *See* 18 U.S.C. § 3626(d) ('The limitations on remedies in this section shall not apply to relief entered by a State court based solely upon claims arising under State law.')."). That Circuit appears to be as certain of this conclusion as the majority here, in dicta, is of the opposite result. The existence of these conflicting obiters underscores the wisdom of not trying to decide the issue until it is firmly presented in a case in which full arguments on both sides are made. *See ante*, concurrence of Judge LEVAL.

### C. What if Any Restrictions Would a Finding of Valid State Contract Claims Impose on State Legislatures?

At oral argument, it was suggested that, if we were to hold that state law contracts could continue to give the relief that was no longer available under the consent decrees, states would be forever frozen into agreements into which they had foolishly entered, even when those agreements were no longer in the public interest. Such an argument, however, misperceives the degree to which a contract binds the state as Sovereign.

As I said at the beginning of this opinion, the Sovereign cannot contract away its powers to govern. It cannot do that any more than it can be precluded from governing by a court judgment or by a consent decree. If the public interest requires it, the Sovereign can pass laws in derogation of any of these, subject only to the constitutional limits that apply to its lawmaking generally. Thus, the federal government can act in derogation of contracts that it has entered into, so long as it is operating under one of its paramount powers and so long as it does not violate any constitutional prohibition, such as those of the Bill of Rights. Similarly, the states can pass laws limiting the effect of their own contracts so long as, in doing so, *they* do not violate any express constitutional prohibitions or valid federal laws.

The fact that the Sovereign is itself a party to a contract is not irrelevant, but it is also in no way determinative. Courts will look with greater skepticism when the Sovereign is a party to a contract and seek to determine whether the government's actions are those of a contracting party trying to get out of a financially bad deal or whether, instead, the government is acting as Sovereign in the public interest. *See* Calabresi, *supra,* 71 Yale L.J. at 1203.

This, in the case of the federal government, means that the courts will not *seek* out a paramount power that would validate the government's action, when that action

enables the government to renege on an unfavorable contract. But it also means that the federal government can nonetheless abrogate a contract that is financially disadvantageous to it, if the statute doing so points out the paramount power and the public interest served by the abrogation. *See Resolution Trust Corp. v. Federal Sav. & Loan Ins. Corp.,* 25 F.3d 1493, 1501 (10th Cir.1994) (noting that where the federal government is a party to a contract, a statute modifying the contract will be subjected to the "sovereign acts" doctrine, under which Congress may abrogate contracts through general legislation, but may not target a class of contracts to which it is a party); *see also United States v. Winstar Corp.,* 518 U.S. 839, 898, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (Souter, *J.*) (plurality opinion) ("The greater the Government's self-interest, ... the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence...."); *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 472, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).

The same reasoning applies, *mutatis mutandis,* to the states, whose sovereignty is both broader and more constricted than that of the federal government. The not unduly burdensome restrictions of due process remain and restrain both Sovereigns to some degree. But, in the end, it should be clear that even if state contract law recognizes a valid agreement between the parties before us, and the PLRA does not itself bar enforcement of the agreement in state courts, this in no way precludes the state of New York, acting as Sovereign in the public interest—and not solely as a contractor looking after its pecuniary interest—from modifying or even doing away with the contract.

### III. A CAUTIONARY NOTE

Having concluded first that the PLRA does not terminate the consent decrees

themselves but only ends future relief (either in state or federal courts) under them, and second that the state law of contracts might give relief analogous to that which is no longer available under the decrees and that such relief is not obviously barred by the PLRA, I am bound both by comity and the respect that I feel for my siblings to give weight to the fact that my views have found no adherence among the other circuits and have been forcefully rejected in my own court. I have done so. But in the end, I still believe that extremely able judges with the best of intentions have decided these issues incorrectly and that there are plausible reasons explaining why this has happened. It is to those reasons that I turn in concluding this opinion.

The first reason is that we all have been trained to downplay the significance of formal rules and to concern ourselves predominantly or even exclusively with results. We tend to look at law primarily as an engine to achieve immediate goals, and to ignore its symbolic significance. Thinking this way, it is all too easy to equate (a) the termination of judicial judgments with (b) changes in underlying laws, when both bring about the same results. But in fact we are wrong.

Of course, results do matter too. But they are not the only things that count. Symbols and formal boundaries can also be deeply important. And an overly functional view of the law can lead to grievous errors. For example, are distinctions expressly based on race the same as rules that have disparate impact on different racial groups? Of course not. This is not to say that disparate impact may not, in some circumstances, be constitutionally or legislatively prohibited.[29] And, indeed, I have urged a greater recognition of the potential constitutional frailty of some arrangements that create disparate impacts. *See* Guido Calabresi, *Foreword: Antidiscrimination and Constitutional Accountability (What the Bork–Brennan Debate Ignores)*, 105 Harv. L.Rev. 80, 115 n.106 (1991).[30] But the fact that some disparate *results* may be invalid, regardless of *how* they are achieved, does not mean that the converse is true. It in no way suggests that, even when results can withstand constitutional scrutiny, there are not some *ways* of achieving the same goals that are barred by the great Charter. The means of accomplishing the ends—whether they be expressly race-conscious distinctions, suits for damages directly brought against the states, or legislative abrogations of court judgments—may fall *in and of themselves*, because to permit them is to allow something whose symbolism is intolerable, and remains so even when an identical result, achieved in other ways, may perhaps be permitted.

Nowhere is this more true than with respect to Separation of Powers. Despite the Supreme Court's ringing formalistic language in this regard, functionalist judges—as all of us tend to be—are reluctant to follow the Court's lead. And this

---

**29.** *See, e.g., Shaw v. Reno,* 509 U.S. 630, 645, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (noting that, in voting rights cases, "district lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption"); *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (holding that, under Title VII, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices").

**30.** *See also United States v. Then,* 56 F.3d 464, 468 (2d Cir.1995) (Calabresi, *J.,* concurring) ("If Congress, for example, though it was made aware of both the dramatically disparate impact among minority groups of enhanced crack penalties and of the limited evidence supporting such enhanced penalties, were nevertheless to act affirmatively and negate the Commission's proposed amendments to the Sentencing Guidelines (or perhaps were even just to allow the 100–to–1 ratio [of sentences for crack cocaine to sentences for powder cocaine] to persist in mandatory minimum sentences), subsequent equal protection challenges based on claims of discriminatory purpose might well lie.").

carries particularly harmful consequences when Separation issues are involved. For, in this area, we cannot rely on any other institution of government to guard the formal boundaries. It is illusory to expect that the legislature or the executive will mind the fence, especially when it is the judiciary's symbolic terrain that is trespassed upon. It is equally illusory to count on the parties to care about formal Separation of Powers notions. When these notions do not affect the result, the parties will not be much interested.[31] If the Separation of Powers—and especially that involving the judiciary—is to be protected in its formal and symbolic importance, the courts must be the guardians. But to do so we must—at least in part—overcome the functionalism that we were all taught.

The second reason for the errors that I believe the *in banc* court's opinion makes stems from federal judges' too ready assumption of their own capacity to ascertain state law. One of the great defects of diversity jurisdiction—which I tend to defend—is that all too often it gets federal judges into the business of determining what the law of the states is.[32] And courts that in ordinary cases believe that they can easily decide what state contract law is may be tempted, as I believe the *in banc*

court was today, to decide what is not for us to say—whether a state should or should not find that a contract exists.

The third reason most circuits have read the PLRA incorrectly has to do with what I think is an unfortunate view commonly taken of legislative history. I am not one who holds that words always or even frequently explain themselves. But that does not mean that specific pronouncements by legislators are free from even greater dangers as sources of legislative intent.[33] All in all, when one must move beyond legislative language, it is often best to do so in the way that was traditional in the English courts. Barred from citing Hansard—the British parliamentary materials—the English courts focused on "the mischief" that a statute sought to cure.[34] Having identified the mischief, they read the words of the law in its clarifying light. Had the various circuits focused on the "mischief" that the PLRA was trying to overcome, they would, I submit, have been far readier to accept a reading of the statute that barred the future effects—state or federal—of the decrees, but did not terminate the decrees themselves.

The final reason why, in my view, many judges get this case wrong stems from an error that is commonly made in dealing

**31.** This was manifest during the *in banc* oral argument in the instant case, at which the plaintiffs expressed little concern with whether the decrees themselves, or only relief under them, would be terminated. The fact that for this reason parties rarely raise or argue such distinctions of course makes it harder for the courts to recognize them.

**32.** To avoid that bad habit, I have argued that we should be much readier to certify questions of state law to state courts. *See McCarthy v. Olin Corp.*, 119 F.3d 148, 157–61 (2d Cir.1997) (Calabresi, *J.*, dissenting). But that practice remains relatively infrequent. *See* John B. Corr & Ira P. Robbins, *Interjurisdictional Certification and Choice of Law*, 41 Vand. L.Rev. 411, 418–31 (1988); *accord* Bradford R. Clark, *Ascertaining the Laws of the Several States: Positivism and Judicial Federalism After Erie*, 145 U. Pa. L.Rev. 1459, 1549 (1997) (observing that certification is

discretionary and occurs on an ad hoc basis within the circuits).

**33.** *See, e.g., Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527–30, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, *J.*, concurring in the judgment).

**34.** *See, e.g., Heydon's Case*, 3 Co. Rep. 7a, 7b, 76 Eng. Rep. 637, 638 (1584) (noting that "the office of all the Judges is always to make such construction as shall suppress the mischief, and advance the remedy"); *accord Gorris v. Scott*, L.R. 9 Ex. 125 (1874); *see also Millar v. Taylor*, 98 Eng. Rep. 201 (1769) (first announcing the rule that courts may not consult Parliamentary material as an aid to statutory construction). Recently, amidst a heated debate, the English courts have (perhaps influenced by the American courts) begun to consult Hansard. *See, e.g., Pepper v. Hart*, 1 All E.R. 42 (1993).

with statutory language. Thus, the *in banc* court readily acknowledges the ambiguities that characterize the operative language of the relevant part of the PLRA. But when the court looks at the definitional section of the law, it deems itself bound by the words used without considering the possibility—patently true in this case—that the definitions are themselves ambiguous. It is as if, when dealing with definitions, legislative language were necessarily clear and therefore had to be read as if it were, despite the manifest abuse of words that such a reading entails.

I would suggest, instead, that definitional parts of a statute, like the rest of the statute, must be given their ordinary meanings, when such meanings make sense, but must be read in their context, with a view toward the *mischief* the statute addresses, when the seemingly ordinary meanings lead to statements that are—to put it mildly—linguistically unnatural. The definition of "relief" in the PLRA, which purports to include in relief "consent decrees" and also to exclude from relief "private settlement agreements," makes no sense. It is bizarre because even if "consent decrees" might (awkwardly as the *in banc* court recognizes) be termed relief, "agreements" are simply not a form of relief. And hence to exclude them would be, if that is what the definition means, an exercise in surplusage and in futility.[35] Read to make sense and read in the light of the mischief to be cured, the definitional section must mean that the relief to be barred in the future includes all relief *available under or pursuant to* consent decrees but does not include *that relief which is available or pursuant to* private settlement agreements. Such an elision would be readily assumed in reading the operative language of a statute if it were needed to make the statute make sense. Why should it not equally be read

back into the definitional section of a law, when to do so accomplishes what the statute was passed to do, preserves the formal boundaries between the branches of government, and makes the definition parse?

\* \* \*

Because I believe the reading given to this statute by the *in banc* court distorts language, presumes a most unlikely congressional intent, improperly seeks to decide questions of state law, and, most important, does grievous damage to the formal lines that separate the coordinate branches of our government and does it to no purpose whatsoever, I respectfully dissent from most of the court's reasoning. Because I agree with the court on why the case must be remanded to the district court, I join Part IV of its opinion. And because—despite what I believe to be a profoundly incorrect discussion—there is little in the court's actual result that I would not also reach, I concur in its judgment.[36]

---

**35.** As I suggested earlier, a legislature can tell us to treat a banana the same way as an apple. But if it seems to say that a banana *is* an apple, we should not hesitate to try to figure out what it really meant to say.

